UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | CASE NO. 3:18CR34(VAB) |
|---|---|---|
| v. | : | |
| SIDIKJON MAMADJONOV | : | May 23, 2019 |

GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS STATEMENTS

The United States of America, by and through the undersigned attorneys, respectfully submits this Response to Defendant's Motion to Suppress Statements, dated April 8, 2019.

FACTUAL BACKGROUND

A. The Indictment

The defendant, Sidikjon Mamadjonov, an Uzbekistan national and legal permanent resident of the United States, is charged in a seven count indictment, returned on February 23, 2018, with making materially false statements in a matter involving international terrorism, in violation of 18 U.S.C. §1001(a)(2); two counts of false swearing in an immigration matter, in violation of 18 U.S.C. §1546(a); and two counts of attempted unlawful procurement of naturalization, in violation of 18 U.S.C. §1425(a).

B. The International Terrorism Investigation

This matter stems from an FBI investigation of Saidjon Mamadjonov ("Saidjon") for terrorism-related offenses related to his travel to Syria in 2013 to engage in violent jihad with the designated foreign terrorist organization Al-Nusrah Front (ANF). Saidjon, who is now deceased, was defendant Sidikjon Mamadjonov's ("Sidikjon" or "Mamadjonov") brother.

Saidjon was also a lawful permanent resident of the United States. Based upon this status, Saidjon may have been allowed to return to the United States should he have presented himself at a U.S. border returning from Syria. The FBI was investigating Saidjon to determine if he had committed violations of 18 U.S.C. §§ 2339A and 2339B, and to determine if he posed a threat to U.S. interests in the homeland or abroad. As discussed below, FBI Agents interviewed Sidikjon multiple times regarding Saidjon and his whereabouts. Sidikjon made materially false statements and intentional omissions in response to questions causing the FBI to expend resources to determine if Saidjon was a threat to the homeland all the while Sidikjon, as described below, knew that his brother Saidjon was already deceased, having died in Syria while fighting for ANF.

At the outset, the FBI obtained records indicating that Saidjon had departed the United States on January 20, 2013, boarding a plane to Istanbul, Turkey. Although Saidjon had booked a roundtrip ticket, records from the U.S. Customs and Border Protection indicated that he did not take that flight and remained outside the United States. Routing through Turkey is a common means used by people aspiring to join a foreign terrorist organization operating in Syria. The FBI also learned that Sidikjon traveled internationally from the United States from on or about May 27, 2013, through on or about June 11, 2013, stopping in, among other places, Turkey. When he made that trip, Sidikjon carried with him $37,000 in cash, which he declared on a Currency and Monetary Instruments Report as he left the country.

During the course of the FBI's investigation of Saidjon, the FBI interviewed Sidikjon on numerous occasions, in order to obtain information as to Saidjon's whereabouts, amongst other matters. Sidikjon provided information to the FBI about his brother as if he were alive and intentionally omitted the fact that he died while fighting with ANF in Syria. Subsequently, the FBI learned that at the time of these interviews, Sidikjon knew his brother was, in fact, deceased.

Nonetheless, during those interviews, Sidikjon concealed the fact that his brother had died while fighting for an FTO in Syria and lied to the FBI Agents when specifically asked if he knew the whereabouts of his brother Saidjon.

### C. The Previous Interviews of Mamadjonov

On May 14, 2014, two FBI Agents interviewed Sidikjon and asked about the purpose of Sidikjon's travel to Turkey in 2013. Sidikjon stated that part of the intended purpose of the trip to Turkey was to meet up with his brother, Saidjon, who was already there. During the interview, Sidikjon offered that his brother Saidjon was currently living in Dubai. As detailed later, as of the interview date, Sidikjon was in possession of documentary evidence confirming that his brother Saidjon was already deceased. Moreover, Sidikjon had a cell phone containing photographic evidence of his deceased brother. During this interview, Sidikjon answered questions as though his brother was still alive and intentionally omitted the fact that his brother was deceased.

On May 29, 2014, FBI Agents again interviewed Sidikjon regarding the whereabouts of his brother, Saidjon. During this interview, Sidikjon stated that during his (Sidikjon's) 2013 trip to Turkey, Sidikjon met up with his brother Saidjon in Istanbul, Turkey. During this interview, Sidikjon answered questions as though his brother was still alive and again intentionally omitted the fact that his brother was deceased.[1]

---

[1] Count I in the Indictment relates to this interview. Defendants did "make a false material statement and representation to the FBI in that he falsely stated that during a 2013 trip to Turkey, he had met with his brother Saidjon in Istanbul, Turkey, and that he believed that Saidjon was still in Turkey, or possibly Dubai; when in fact, as he then and there well knew, he learned and understood either before or during this 2013 trip that Saidjon was dead."

3

On September 12, 2014, FBI Agents again interviewed Sidikjon in relation to Saidjon. During this interview, Sidikjon answered questions as though his brother was still alive and omitted the fact that his brother was deceased.

On November 18, 2014, two FBI Agents interviewed Sidikjon about his brother, Saidjon. Sidikjon stated he believed that Saidjon was living in Turkey after getting married. Sidikjon stated that he had not heard from his brother because Saidjon married a woman who was not Uzbeki and that caused problems within the Mamadjonov family. During this interview Sidikjon informed agents that he received, via Federal Express, a package Saidjon sent from Turkey containing Saidjon's cell phone. Sidikjon stated that this phone was an iPhone. Sidikjon stated that this package arrived a few weeks after Sidikjon returned to the United States from his own travel to Turkey. Sidikjon stated that he thought Saidjon returned the iPhone, which was a gift from Sidikjon, because Saidjon was cutting off all family ties and no longer wanted to keep anything that had come from family members. Sidikjon stated that this package was addressed to him at his previous residence of 9232 Townridge, Middletown, Connecticut. During this interview, Sidikjon once again answered questions as though his brother was still alive and intentionally omitted the fact that his brother was deceased.[2]

Records in possession of the FBI confirm that a DHL package from Istanbul, Turkey was sent on or about June 27, 2013, to Sidikjon and Saidjon's father at 83 S Eagle Street in Terryville, CT. The sender of the package was listed as "Saidjon Mamadjonov." As is set forth below, at the time the package was sent, Sidikjon knew his brother was dead. Additionally, two addressing

---

[2] Count II of the Indictment relates to this interview. Defendant did "make a false material statement and representation to the FBI in that he falsely stated that he believed his brother Saidjon was married and living in Turkey; and that after Sidikjon returned from Turkey in 2013, Saidjon had sent him a package, via Federal Express, from Turkey; when, as he then and there well knew, he had learned and understood that Saidjon was dead, having died prior to the date the package was sent."

mistakes on the package indicate that the package was sent by someone unfamiliar with the United States or the Mamadjonov family. The first mistake noted was a misspelling of the father's name. The package is addressed to "Sodio Mamadjonov," whereas the father's name is spelled "Sodik Mamadjonov" (sometimes spelled "Sodiq Mamadjonov"). Secondly, the address on the package is "83S Eagle St.; NEWYORK CT 06786, CT." These addressing errors demonstrate that Saidjon was not the person who sent the package as Saidjon would have known his father's name and the proper way to address a package in the United States as he had lived in the United States.

As set forth above, Sidikjon stated he received the package from his brother a few weeks after his return to the United States from his trip to Turkey. The records described above reflect the DHL package was sent on or about June 23, 2013. As detailed below, Sidikjon received the package containing his deceased brother's iPhone approximately 11 months prior to the May 2014 interviews.

On August 17, 2016, FBI Agents interviewed Sidikjon again and asked Sidikjon if he knew the whereabouts of his brother Saidjon. Sidikjon stated that he did not know the whereabouts of his brother Saidjon. Also, during this interview Sidikjon reiterated his earlier statement that he received a FedEx package from Saidjon that contained the iPhone.[3]

At the time of the interviews of Sidikjon outlined above, the FBI was not aware of the contents of the iPhone. At the time of the interviews, the FBI was conducting the investigation of Saidjon, and as part of the investigation, attempting to locate and interview Saidjon. As such,

---

[3] Count III of the Indictment relates to this interview. Defendant did "make a false material statement and representation to the FBI in that he falsely stated he had not heard any discussions about Uzbeks in the United States going over to Syria to fight in the war; and was not aware of any Uzbeks ever leaving the United States to travel to Syria; when, as he then and there well knew, his brother Saidjon was an Uzbek who had traveled from the United States to Syria and had died while fighting for a designated FTO, Al Nusrah Front."

5

when Sidikjon informed agents that he believed his brother was alive, or that he did not know Saidjon's whereabouts, the FBI did not have information to the contrary.

On November 20, 2017, the FBI executed a federal search warrant at Sidikjon's residence. Sidikjon agreed to be interviewed. Sidikjon admitted that he lied to agents in each of the five previous interviews. He indicated that at the time of those interviews he knew his brother was dead and that he had been killed fighting with the designated foreign terrorist organization Al Nusrah Front in Syria. Sidikjon told agents he learned of his brother's death when he traveled to Turkey in May 2013. He also indicated that the package he received containing the iPhone and ring did not come from Saidjon; rather it was sent by other individuals in Istanbul, Turkey. Sidikjon explained that the iPhone contained videos/photos of his brother fighting in Syria and of his brother dead with his head partially blown off.

D. <u>The Search Warrant and Interview</u>

On the day of the search and interview, a team of 27 FBI Agents or supporting personnel arrived at the address – 50 Childs Street, New Britain, Connecticut – at 7:00 a.m.[4] The case agent, Special Agent Andrew Litowitz (SA Litowitz), was with the initial entry team. He observed the FBI Agents as they executed a *knock and announce*. In order to do so, they pulled open the screen door of the residence to gain access to the front door and knock, breaking the latch to the screen door in the process. After the entry team knocked and announced their purpose, the defendant immediately answered the door. As they entered, members of the entry

---

[4] The team was large in part because the agents anticipated five adults lived at the residence, each of whom might require an interview. Interviews are done in teams of two, so that five adults required 10 agents for interviews. In addition, the agents anticipated seizing a substantial amount of electronic media, and therefore brought the New Haven Division's Evidence Retrieval Team, which consists of 8 people.

team had their weapons drawn; however, they put the weapons away once the security sweep was complete. Mamadjonov was not fully dressed, and agents brought clothes to him in the living room,[5] which served as the staging area for each of the occupants of the residence.

Soon after the FBI entered the residence, SA Litowitz, who had interviewed Mamadjonov previously, approached the defendant in the living room and said, "Do you remember me?" Referring to the iPhone referenced in the November 18, 2014 interview, he asked, "Where's the iPhone?" SA Litowitz told Mamadjonov that the reason the FBI was there was because they believed he had lied to them in previous interviews.

Task Force Officer Jeffrey Morande of the Hartford Police Department and SA Litowitz were working together. After the initial exchange regarding the iPhone, they, along with Mamadjonov, moved to the breezeway between the main house and the garage. Initially, they explained to Mamadjonov that the team of agents who accompanied them would be executing a search warrant of the house. They provided him a copy of the warrant, explained its purpose, and allowed him time to review it. Mamadjonov declined the agents' offer to review the warrant with him. Agents Litowitz and Morande told Mamadjonov that he was not under arrest and that he did not need to speak with agents.[6]

---

[5] Because the FBI is concerned with occupants of the dwelling interfering with evidence that fell within the scope of the warrant, occupants are generally not allowed to roam freely in the residence during the conduct of a search.

[6] While the agents did not tell him he was free to leave the residence, they never told him that he was not free to leave. As the Supreme Court observed: "we may safely assume that most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions." *Michigan v. Summers*, 452 U.S. 692, 701 (1981).

SA Litowitz asked Mamadjonov if he would be willing to talk to the agents, reminding him that, at one point he had a lawyer. Mamadjonov stated that he would talk without a lawyer. The agents told Mamadjonov that he was free to stop answering questions if he wanted.

In settling on the location for the interview, the agents suggested to Mamadjonov that they could talk where they were in the breezeway, or at a coffee shop, or the New Britain Police Department, or some other location within the residence of Mamadjonov's choosing. Mamadjonov suggested going to the basement of the residence. On the way to the basement, he apologized for lying in the prior interviews.

The basement was largely unfurnished. Mamadjonov located two chairs for the agents and sat on a cooler opposite the agents with a coffee table between them. *See* Exhibit A. The three – Mamadjonov, SA Litowitz and Morande – sat in a large open area in the basement. On initial entry into the residence, both agents Litowitz and Morande were wearing ballistic vests. Once the premises were secure, they removed that gear to do the interview. Each of the agents was armed with a handgun, which was holstered on the waist. During the interview, the balance of the FBI Agents were upstairs conducting the search or other interviews, except when Special Agents Andrew Klopfer, Michelle Vu[7] and Matt Hohmann[8] sat in on portions of the Mamadjonov interview. The other time there were additional persons in the basement was the period of time during which the FBI Agents took photos of the basement, and searched that part

---

[7] Special Agent Michelle Vu of the New York Field Office of the FBI conducted part of the interview relating to a separate investigation of numerous Uzbek nationals centered in Brooklyn, New York, providing material support to the Islamic State of Iraq and al-Sham, by raising money and facilitating travel for young men to go to Syria and engage in violent jihad.

[8] Special Agent Hohmann had a separate investigation out of the New Jersey Field Office of the FBI, about which he wished to question Mamadjonov.

of the premises. Additionally, when Mamadjonov's mother persisted in lying to the FBI Agents during her interview, the agents asked if Mamadjonov would talk to his mother. Mamadjonov agreed that he would tell her that it would be okay to tell the truth. When he did so, two additional FBI Agents escorted Mamadjonov's mother to the basement. An Uzbek translator told the agents that Mamadjonov told his mother that she did not have to lie and it was okay to tell the truth, or words to that effect.

Mamadjonov needed to take bathroom breaks during the interview. He was also allowed to take breaks to see his family. When he would do so, an FBI Agent would accompany him to another area of the house that was being searched, wait for him, and then return with him to the basement.

The tone of the interview was conversational. The agents did not raise their voices. The agents describe Mamadjonov as cooperative. Indeed, while he might not have been completely honest throughout the interview, he had from the outset, even before sitting down with them, set the record straight that he had been lying to the agents in the prior interviews.

The interview lasted approximately three hours. After the interview concluded, Mamadjonov went upstairs to be with his family seated in the living room as the search continued. As is routine when subjects remain at the premises during the execution of a search, two to three armed FBI Agents were posted in the living room to prevent people wandering around the house while the search was in progress.

Mamadjonov asked agents if he had any restrictions on whom he could talk to or visit. SA Litowitz advised that he had no restrictions and reminded Mamadjonov he was not under

arrest. Mamadjonov pleaded that he did not want to be arrested or taken from his family, even offering – if it came to that – to wear a monitoring device on his ankle to restrict his movements.

Significantly, as the agents were discharging members of the search teams, in advance of leaving the residence, Mamadjonov approached SA Litowitz and expressed interest in becoming a paid source for the FBI. Separately, after they had concluded the interview in the basement, Agents Litowitz and Morande asked if Mamadjonov would be willing to talk to them again. Mamadjonov agreed and took the contact information of both Agents Litowitz and Morande. He further agreed to come to the FBI Office in New Haven, the following day to take a polygraph examination. After the agents confirmed the availability of the polygrapher, they and Mamadjonov settled on a time of 9 a.m. The FBI left the residence at approximately 12:35 p.m.

The following day, Mamadjonov came to the New Haven Office of the FBI, and met Special Agent William Aldenberg, the polygrapher. Prior to beginning the examination, SA Aldenberg advised Mamadjonov of his *Miranda* rights. SA Aldenberg provided an Advice of Rights Form and a Consent to Interview With Polygraph. He explained both forms to Mamadjonov, who read the forms and executed the *Miranda* waiver (attached as Exhibit B) and polygraph consent form (Exhibit C). SA Aldenberg also explained that Mamadjonov was free to leave at any time, and he could refuse to answer any question put to him. In the course of the interview that followed, Mamadjonov gave a statement to the FBI that was substantially the same as that he had given on the prior day at his residence.

ARGUMENT

A. The November 20, 2017 Interview Was Non-Custodial

Mamadjonov contends that his unwarned interview on the day of the search warrant of his home was custodial. He asserts that in the absence of *Miranda* warnings, the statements should be suppressed. Mamadjonov primarily relies upon the Fourth Circuit decision in *United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2011), where the court determined an interview involving three hours of questioning during a search of the defendant's home by large number of federal agents was custodial. The *Hashime* Court found the large number of armed law-enforcement agents, the suspect's isolation during his interrogation, and the suspect and his family's loss of control over their home made the circumstances of the questioning custodial under Fourth Circuit law. *Id.* (citing *United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007)).

Defendant's reliance on *Hashime* is misplaced, as the facts giving rise to the Fourth Circuit's decision are distinct from those present here. Moreover, the Second Circuit, in *United States v. Faux*, 828 F.3d 130, 137 (2d Cir. 2016), has rejected the very argument defendant, relying on *Hashime*, advances here, *i.e.,* that his "loss of control" of his home establishes that he was in custody. *See also United States v. Schaffer*, 851 F.3d 166 (2d Cir. 2017).

The applicable legal standard is well-settled. In *Faux*, 828 F.3d at 135, the Second Circuit stated:

> In determining whether a suspect was in custody, a court looks at all the surrounding circumstances. The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v.*

*Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury v. California*, 511 U.S. 318, 322(1994)).

The *Faux* Court noted "courts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is "in custody." *See, e.g., United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) ("[G]iven the district court's factual findings—and in particular its finding that the agents informed the defendant and his wife that they were not under arrest and could ask the agents to leave at any time ... we find that a reasonable person would have understood that he or she was not in custody." (citations omitted)). *Faux*, 828 F.3d at 135–36. The result should be no different here.

The government acknowledges the team of agents that arrived at Mamdjonov's house for the search was large.[9] However, it is clear that two agents conducted the bulk of Mamadjonov's three-hour interview, at a location of Mamadjonov's choosing, accompanied at times by a supervisor, and intermittently by agents from New York and New Jersey who were interested in obtaining information about their own, separate investigations (and contributing to the length of the questioning).

There is no doubt that Mamadjonov was aware numerous agents were searching his home during the interview, but that is insufficient to establish custody. In fact, in the Second Circuit, the contrary is true. *See, e.g., United States v. Crooker*, 688 F.3d 1, 11-12 (1st Cir. 2012) (although "numerous officers" were "present inside and around Crooker's house, Crooker not 'in custody' where no more than two agents were in direct conversation with Crooker at one time"); *United States v. Ross,* 719 F.2d 615, 616 (2d Cir. 1983) (defendant not "in custody" despite the presence

---

[9] As it turned out, the team was larger than it needed to be. Two of the adults were not at the residence, so that four interviewing agents were superfluous: and, because the search did not locate any electronic media, the eight-member Evidence Retrieval Team was not needed.

of "more than 20 agents of the Internal Revenue Service" to execute a search warrant). *See also United States v. Newton*, 369 F.3d 659, 675 (2nd Cir. 2004) ("The number of officers on the scene would not, by itself, have led a reasonable person in Newton's shoes to conclude that he was in custody."); *Badmus*, 325 F.3d at 139 (defendant not "in custody" where "there were half a dozen officers in the apartment and it's not a big apartment" and officers' firearms "may have been visible") (internal quotation marks and modifications omitted).

Although Mamadjonov was not permitted to roam freely through his home, he was permitted to move within the home accompanied by an agent. In that respect, he was treated no differently than the rest of his family. Such accompaniment does not render an interview custodial in this Circuit. In *Faux*, 828 F.3d at 137, the Second Circuit rejected defendant's contention that such a restriction on movement renders the interrogation custodial stating:

> The condition imposed on [defendant's] movements did not amount to custody. *Cf. United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that Ross was told he would be accompanied by an IRS agent when he moved about the restaurant did not place him in custody within the meaning of *Miranda* ...."). [Defendant] may have been seized, but . . . not every seizure amounts to custody. *See Newton*, 369 F.3d at 672. A reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution and that (absent other hallmarks of custody) freedom of action is not being curtailed "to a degree associated with formal arrest." *Id.* Although [defendant] was not permitted to go from room to room without being accompanied, she was not "completely at the mercy of the police." *Newton*, 369 F.3d at 675 (quoting *Berkemer*, 468 U.S. at 438).

*See also United States v. Kirsteins*, 906 F.2d 919, 924 (2d Cir. 1990) (defendant not "in custody" when escorted to the street and back during a break in questioning). The Second Circuit has found that individuals subjected to greater restrictions on their freedom of movement during searches were not "in custody." *See, e.g.*, *United States v. Kirsh*, 54 F.3d 1062, 1067 (2nd Cir. 1995) (defendant not permitted to enter her apartment during execution of search warrant);

*Badmus*, 325 F.3d at 139 (defendant and his wife "asked to stay seated in the living room" during three-hour consent search of their apartment).

Moreover, an objectively reasonable person in Mamadjonov's circumstances at least would have understood the obvious concern for evidence preservation. *Cf. United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002) ("From an objective viewpoint, a reasonable person in Axsom's shoes should have realized the agents escorted him not to restrict his movement, but to protect themselves and the integrity of the search."). Moreover, the agents had informed Mamadjonov that he was not under arrest, which would affect an objectively reasonable person's consideration of the subsequent accompaniment. The fact that agents escorted Mamadjonov around the search site is simply the cautious—and reasonable—conduct that would be expected in the execution of a lawful search warrant in a private residence.[10]

In this search, Mamadjonov knew that, among other things, the FBI was looking for the iPhone and other electronic media containing communications between him and his brother. Evidence like this would need to be processed and reviewed in detail, and was therefore unlikely to result in an arrest at the time of the search. To a reasonable person in Mamadjonov's position (fully aware of the nature of the investigation by virtue of the numerous prior interviews), the number of agents (or the fact that they were armed) simply does not indicate that arrest is imminent, especially where the agents affirmatively stated that he was not under arrest.

---

[10] Under *Michigan v. Summers*, 452 U.S. 692 (1981), law enforcement officers are permitted to detain occupants of a residence during the execution of a search warrant. According to FBI's standard search protocol, individuals generally are not permitted to roam freely at search sites based on concerns of officer safety and evidence preservation.

Considered collectively, (1) the absence of an arrest and the agent's affirmative statement that Mamadjonov was not under arrest;[11] (2) the agent's representation that even if he did talk, Mamadjonov could stop answering questions at any time if he wanted to; (3) Mamadjonov voluntarily agreed to speak to agents; (4) the absence of handcuffs or physical restraints during the interview; (5) the concealment of firearms, after entry;[12] (6) the location of the interview selected by Mamadjonov; (7) the nature of the interview, including the fact that Mamadjonov was able to take bathroom breaks and see his family when he requested to do so; and (8) the fact that there was never a request for an attorney, establish that Mamadjonov was not "in custody" for *Miranda* purposes, even where the execution of a search warrant necessitated restrictions on the defendant and his family's freedom of movement within the house.

---

[11] Defendant avers that he feared he was about to be taken to the police station. *See* Motion to Suppress, Ex. 1. at ¶4. In *Faux*, 828 F.3d at 138, the Second Circuit addressed this position.

> "[A] reasonable person told ... that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station—a significant factor in assessing the degree to which one is at 'the mercy' of the authorities." *Newton*, 369 F.3d at 677.

[12] Defendant suggests the *Faux* court "stressed, agents did not even draw their weapons." *See* Motiion to Suppress at p.8. Defendant's reliance on whether agents executing a search warrant drew their weapons is misplaced. In *United States v. Simmonds*, 641 Fed. Appx 99, 103 (2d Cir. 2016)(relied upon by defendant) the Second Circuit explained the use of weapons--in the manner that occurred here--does not support a custody determination:

> [T]he fact that the officers initially used firearms and briefly searched [defendant] does not compel a conclusion that the ensuing interrogation was custodial, especially where the use of firearms was "necessitated by the officers' safety concerns" and ended "as soon as ... the perceived security threat abated." *United States v. Cota,* 953 F.2d 753, 759 (2d Cir. 1992); *see Cruz v. Miller,* 255 F.3d 77, 86 (2d Cir. 2001) (noting that "[s]everal courts have ruled that an initial display of guns, subsequently reholstered, does not result in 'custody' that requires *Miranda* warnings").

This is particularly so where Mamadjonov's statements to the agents demonstrate that he did not perceive he was in custody. As stated previously, Mamadjonov asked the agents if there were any restrictions on who he could talk to or visit going forward, and SA Litowitz reminded him he was not under arrest. Moreover, Mamadjonov pleaded with the agents that he did not want to be arrested, offering to wear a monitoring device if it would forestall arrest. *See supra* at p.10. These are not the inquiries of an individual who perceived his freedom of action had been curtailed to the "degree associated with formal arrest." The totality of the circumstances in this case therefore does not rise to the level of custody (or coercion) that triggers *Miranda* warnings.

The facts of this case differ greatly from the circumstances of interrogations at other search sites that were found to be custodial. For example, the "in custody" determination in *Newton* turned on the fact that the defendant was handcuffed immediately after opening the door—clad only in his underwear—in response to the persistent and extended knocking of six law enforcement officers. *See Newton*, 369 F.3d at 676-77. This handcuffing—a "hallmark of a formal arrest"— did not occur here. Similarly, the "in custody" determination in *United States v. Craighead,* 539 F.3d 1073 (9th Cir. 2008), turned in large part of the location of the interview, in "the dark recess of the back storage room" where "an armed detective wearing a raid vest" stood in front of the "single door." *Id.* at 1089. The Ninth Circuit contrasted that custodial interrogation with other locations within the home. *See id.* at 1088 ("An interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere."). In *Hashime*, the Court noted how the 19 year-old defendant was rousted from his bed at gunpoint, and separated from his family and placed is a small storage room with two agents for three hours of questioning. Here, Mamadjonov answered the door in

response to the agent's knock and SA Litowitz almost immediately told him what was happening. The basement location of the interview was the place of Mamadjonov's own choosing, and an accommodation to allow Mamadjonov to speak freely in private. He was able to take breaks to see his family and, at one point, saw his mother, encouraging her to tell the truth. His conversational interview in the basement location is thus far different from the custodial interrogations in *Newton*, *Craighead*, and *Hashime*.[13]

Finally, many of the circumstances which defendant relies upon to establish custody in this case—the presence of large numbers of armed agents, the fact that individuals are not usually permitted to roam freely throughout the search site, that individuals might not feel they are free to leave their home, that individuals may be questioned separately—are present at virtually every residential search. It simply is not the case that one's presence at the scene of a search warrant execution is equivalent to a formal arrest. "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *McCarty*, 468 U.S. at 437. The circumstances of Mamadjonov's case simply do not implicate those concerns.

## B. The November 21, 2017, Confession is Admissible

Mamadjonov's full confession to the FBI polygrapher, after waiving his *Miranda* rights, on November 21, 2017--the day following the interview conducted during the search of his

---

[13] This case is also distinguishable from *Colanna*, 511 F.3d at 435-36--a case relied upon by the *Hashime* Court. In *Colanna*, which involved a search by 24 agents, the court noted evidence of the police dominated environment included: the suspect was awakened at gunpoint; questioned in an FBI vehicle "bracketed by two armed agents;" and was never told he did not have to respond to questions. These factors are not present here.

home--is admissible regardless of the determination the Court makes regarding custody.[14] As the defendant concedes, the Supreme Court has rejected the proposition that "the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." *Oregon v. Elstad*, 470 U.S. 298, 312 (1985). Defendant concedes that on this record, *Elstad* precludes suppression of the November 21, 2017 statements. Defendant's Motion to Suppress at p.11. Therefore, Mamadjonov's statements on November 21, 2017, which are in all material aspects the same as those made the day before, are admissible pursuant to *Oregon v. Elstad*.

For all the foregoing reasons, the defendant's motion to suppress should be denied.

JOHN H. DURHAM
UNITED STATES ATTORNEY


*/s Douglas P. Morabito*

DOUGLAS P. MORABITO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT20962
157 Church Street
New Haven, CT 06510
(203) 821-3700

STEVEN WARD
TRIAL ATTORNEY
Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
(202) 305-2461

---

[14] Moreover, the fact that Mamadjonov was willing to come to the FBI office the following day to take a polygraph speaks volumes as to whether he was in custody.

CERTIFICATE OF SERVICE

       I hereby certify that on May 23, 2019, a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

       /s Douglas P. Morabito
DOUGLAS P. MORABITO
ASSISTANT UNITED STATES ATTORNEY