## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   *Plaintiff,*<br><br>v.<br><br>SIDIKJON MAMADJONOV,<br>   *Defendant*. | No. 3:18-cr-34 (VAB) |

### RULING ON MOTION TO SUPPRESS

On April 11, 2019, Sidikjon Mamadjonov ("Mr. Mamadjonov" or "Defendant") moved to suppress statements made to law enforcement agents before his arrest and statements made to law enforcement agents after his arrest. *See* Mot. to Suppress, ECF No. 60 (Apr. 08, 2019) ("Mot. to Suppress").

On May 23, 2019, the United States of America (the "Government") opposed Defendant's Motion to Suppress. *See* Mem. in Supp. of Gov't's Opp'n to Def's Mot. to Suppress, ECF No. 67 (May 23, 2019) ("Gov't. Opp'n").

On November 30, 2022, the Court held a hearing on the pending motion to suppress. *See* Min. Entry, ECF No. 127 (Nov. 30, 2022).

For the following reasons, Defendant's motion to suppress is **DENIED.**

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Findings of Fact[1]

On November 20, 2017, law enforcement officials arrived at Mr. Mamadjonov's home at 50 Childs Street, New Britain, Connecticut, to execute a federal search warrant. Supp Hearing Tr. at 29. According to FBI Special Agent Litowitz, the agents both knocked and announced their presence. *Id.* at 26. The agents pulled opened the screen door of the residence, breaking the latch to the screen door in the process. *Id.* at 32. After the entry team knocked and announced their purpose, Mr. Mamadjonov immediately answered the door. *Id.* As they entered, members of the entry team had their weapons drawn; however, they put the weapons away once the security sweep was complete. *Id.* at 33. Mr. Mamadjonov was not fully dressed, and agents brought clothes to him in the living room, which served as the staging area for each of the occupants of the residence. *Id.* at 35.

Task Force Officer Jeffrey Morande of the Hartford Police Department and Special Agent Litowitz were working together. *Id.* They moved Mr. Mamadjonov to the breezeway between the main house and the garage. *Id.* at 36. Initially, they explained to Mr. Mamadjonov that the team of agents who accompanied them would be executing a search warrant of the house. *Id.* at 41. They provided him a copy of the warrant and explained its purpose. *Id.* They informed Mr. Mamadjonov that that he was not under arrest and that he did not need to speak with agents. *Id.* at 38.

---

[1] Unless expressly stated otherwise, the Court makes the following findings based on the testimony of Federal Bureau of Investigation ("FBI") Special Agent Andre Litowitz and Sergeant Morande and the exhibits introduced at the evidentiary hearing.

FBI Special Agent Litowitz asked Mr. Mamadjonov if he would be willing to talk to the agents, reminding him that, at one point, he had a lawyer. *Id.* at 130. Mr. Mamadjonov stated that he would talk without a lawyer. *Id.* The agents told Mr. Mamadjonov that he was free to stop speaking with them if he wanted. *Id.* at 151.

Then, the agents suggested to Mr. Mamadjonov that they could talk where they were in the breezeway, or at a Dunkin Donuts, or the New Britain Police Department, or some other location within the residence at Mr. Mamadjonov's choosing. *Id.* at 41–42. Mr. Mamadjonov suggested going to the basement of the residence. *Id.* The basement was largely unfurnished. Mr. Mamadjonov located two chairs for the agents and sat on a cooler opposite the agents with a coffee table between them. *Id.* at 45.

During the interview, the agents permitted Mr. Mamadjonov to take bathroom breaks, and to see his family. *Id.* at 135. When he did so, an FBI Agent would accompany him to another area of the house that was being searched, wait for him, and then return with him to the basement. *Id.* The interview lasted approximately three hours. *Id.* at 99.

After the interview ended, Mr. Mamadjonov went upstairs to be with his family seated in the living room as the search continued. *Id.* Mr. Mamadjonov asked the agents if he had any restrictions on whom he could talk to or visit. *Id.* FBI Special Agent Litowitz advised that he had no restrictions and reminded Mr. Mamadjonov he was not under arrest. *Id.* Mr. Mamadjonov pleaded that he did not want to be arrested or taken from his family, and asked to wear a monitoring device on his ankle to restrict his movements. *Id.*

After concluding the interview in the basement, Agents Litowitz and Morande asked if Mr. Mamadjonov would be willing to talk to them again. *Id.* at 138. Mr. Mamadjonov agreed and took the contact information of both Agents Litowitz and Morande. *Id.* He

further agreed to come to the FBI Office in New Haven, the following day to take a polygraph examination. *Id.* at 107. After the agents confirmed the availability of the polygrapher, they settled on a time. *Id.* at 56. The FBI left the residence at approximately 12:35 p.m. *Id.* at 80.

On November 21, 2017, Mr. Mamadjonov came to the New Haven Office of the FBI, and met with FBI Special Agent William Aldenberg, the polygrapher. *Id.* at 56. Before beginning the examination, Special Agent Aldenberg advised Mr. Mamadjonov of his *Miranda* rights. *Id.* Special Agent Aldenberg provided an Advice of Rights Form and a Consent to Interview With Polygraph. *Id.* He explained both forms to Mr. Mamadjonov, who read the forms and signed the *Miranda* waiver. *Id.* Special Agent Aldenberg also explained that Mr. Mamadjonov was free to leave at any time, and he could refuse to answer any question put to him. *Id.* Subsequently, Mr. Mamadjonov gave a statement to the FBI that was substantially the same as that he had given on the prior day at his residence. *Id.*

### B. Procedural Background

On December 21, 2017, the Government filed a criminal complaint against Mr. Mamadjonov. Compl., ECF No. 1 (Dec. 21, 2017).

On February 23, 2018, a grand jury indicted Mr. Mamadjonov. Indictment, ECF No. 28 (Feb.23, 2018).

On March 22, 2018, at his arraignment, Mr. Mamadjonov entered a plea of not guilty. Min. Entry, ECF No. 33 (Mar. 22, 2018).

On April 08, 2019, Mr. Mamadjonov moved to suppress statements made before and after his arrest. Mot. to Suppress, ECF No. 60; Mem. in Supp. of Mot. to Suppress, ECF No. 61 (April 08, 2019) ("Mot. to Sup.").

On May 23, 2019, the Government filed a memorandum in support of its opposition. Mem. in Supp. of Gov't's Opp'n to Def's Mot. to Suppress, ECF No. 67 (May 23, 2019) ("Gov't. Opp'n").

On November 30, 2022, the Court held a hearing on the motion to suppress. Min. Entry, ECF No. 127 (Nov.30, 2022).

On December 16, 2022, Mr. Mamadjonov filed a supplemental suppression memorandum in support of his motion to suppress. Def. Suppl. Suppression Memo., ECF No. 134 (Dec. 16, 2022) ("Suppl. Memo.") .

On December 23, 2022, the government filed a response memorandum to Mr. Mamadjonov's supplemental suppression memorandum Gov't. Mem. of Law. in Response to Def.'s Pretrials Mtns., ECF No. 145 (Dec. 23, 2022) ("Gov't. Resp.").

On January 06, 2023, Mr. Mamadjonov filed a reply memorandum in further support of his motion to suppress. Def.'s Suppl. Suppression Reply Memo., ECF No. 153 (Jan. 06, 2023) ("Def. Reply").

## II.   STANDARD OF REVIEW

When an individual is questioned in police custody, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona,* 384 U.S. 436, 479 (1966). "Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016).

Before trial, a criminal defendant may move to suppress evidence that was obtained illegally, including statements elicited in violation of *Miranda*. *See* Fed. R. Crim. P. 12(b)(3)(C). On a motion to suppress, the government bears the burden of proving by a preponderance of the evidence that the defendant's statement is admissible. *See Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality opinion) ("[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.").

## III. DISCUSSION

"It is well settled that before a suspect may properly be subjected to custodial interrogation, he must be informed that he has the right to remain silent, that any statement he makes may be used in evidence against him, and that he has the right to have counsel present." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (citing *Miranda*, 384 U.S. at 467-71). "In *Miranda v. Arizona*, the Supreme Court made clear that the prosecution may not use statements made by a suspect under custodial interrogation unless the suspect (1) has been apprised of his Fifth Amendment rights, and (2) knowingly, intelligently, and voluntarily waives those rights." *United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012) (citing *Miranda*, 384 U.S. at 444-45).

When an individual is questioned in police custody, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. "[C]ourts must presume that a defendant did not waive his [*Miranda*] rights." *North Carolina v. Butler*, 441 U.S. 369,

373 (1979). "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).

To determine whether a defendant has knowingly and voluntarily waived his *Miranda* rights, courts must consider the "totality of the circumstances." *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979). "The government bears the burden of establishing by a preponderance of the evidence that the defendant knowingly and voluntarily waived his rights." *United States v. Fable*, No. 3:18-CR-00003 (JCH), 2018 WL 3727346, at *7 (D. Conn. July 24, 2018) (citing *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014)); *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

Mr. Mamadjonov moves to suppress statements made to law enforcement on November 20th and 21st, 2017. Mot to Supp. at 1. In his view, "[t]he police seized [Mr. Mamadjonov]'s person without an arrest warrant when they questioned him for upwards of five hours in the basement of his home." *Id* at 6. He further argues that "[h]eavily armed agents interrogated [Mr. Mamadjonov] for hours in the basement of his home." *Id* at 7. Additionally, Mr. Mamadjonov argues that "[Defendant]'s follow- up statements to the FBI on November 21, 2017, came on the heels of his unlawful unmirandized interrogation in which he let the cat out of the bag." *Id* at 11 (internal quotations omitted).

The Government responds that "the November 20, 2017 interview was non-custodial." Gov't. Opp'n at 11. Additionally, the Government notes that "many of the circumstances which defendant relies upon to establish custody in this case—the

7

presence of large numbers of armed agents, the fact that individuals are not usually permitted to roam freely throughout the search site, that individuals might not feel they are free to leave their home, that individuals may be questioned separately—are present at virtually every residential search." *Id* at 17.  According to the Government, "[i]t simply is not the case that one's presence at the scene of a search warrant execution is equivalent to a formal arrest." *Id.* Moreover, the Government argues that "[Mr. Mamadjonov]'s full confession to the FBI polygrapher, after waiving his Miranda rights, on November 21, 2017--the day following the interview conducted during the search of his --is admissible regardless of the determination the Court makes regarding custody." *Id* at 17-18.

Mr. Mamadjonov filed a supplemental memorandum arguing that the "Court should order the government to produce SA Litowitz's Operations Order pursuant to Fed. R. Crim. P. 16 and 26.2 and Fed. R. Evid. 612." Suppl. Memo at 1. He contends that "[t]he evidence presented at the evidentiary hearing to date, moreover, highlights the relevance of this material not only with respect to the interrogation of Mr. Mamadjonov during the search of his home, but the following day as well." *Id.* "Defendant intends to further develop the record on this issue through further cross-examination of SA Litowitz as well as through Supervisory Special Agent Andrew Klopfer, whose activities were discussed at length during the hearing but who has not yet testified." *Id.*

The Government filed a response to Mr. Mamadjonov's supplemental memorandum arguing that "the motion  [to suppress] can and should be denied, based on the testimony and evidence already before the Court," and "additional testimony would not shed light on the dispositive issues: whether Mamadjonov was in custody, whether he was interviewed voluntarily, and whether the post- polygraph interview on November 21, 2017 was tainted by

the interview conducted on the day of the search." Gov't. Resp. at 3.

The Government further argues that it has "provided a copy of the ops order to the defense as Protected Discovery Material, redacting only classification markings, the case number, and agent telephone numbers," and "[a] review of the ops order shows that Mamadjonov's speculation – that previously redacted portions of the ops order would support his claim that the agents used a "deliberate two-step technique" to avoid giving *Miranda* warnings – is baseless. *Id.* "The previously redacted information was also not relevant, or was already known to the defense and covered in cross examination." *Id.* Moreover, the Government argues that the "[previously redacted information] does not provide a basis for extending a suppression hearing that has already established that Mamadjonov was not in custody and not coerced." *Id.*

Mr. Mamadjonov responds that "[t]he government in this case, having blatantly—and admittedly—violated its disclosure obligations, including under the Jencks Act, now asks the Court to reward its misconduct by cutting short the ongoing evidentiary hearing on defendant's motion to suppress," and "[s]uch an outcome would be wholly inappropriate, particularly in light of substantial outstanding question regarding the FBI's use of potentially coercive bad cop pressure tactics in interrogating Mr. Mamadjonov." Def. Reply at 1 (internal quotation marks omitted). Mr. Mamadjonov argues that "the government's blatant and admitted discovery violation entitles the defense to make use of the newly disclosed operations order in its cross examination of that reports author," and "Defendant intends to do so and to call its own witnesses—including SSA Klopfer." *Id.* at 3. Mr. Mamadjonov concludes that "[b]ecause of the government's misconduct and the contradictions in the testimony of its witnesses, the suppression hearing in this case is not over." *Id.*

The Court disagrees.

"The test for determining custody is an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury v. California*, 511 U.S. 318, 322(1994)) ."Although both elements are required, the second is the 'ultimate inquiry' because a 'free-to-leave inquiry reveals only whether the person questioned was seized.'" *Faux,* 828 F. 3d at 135  (quoting *Newton*, 369 F.3d at 672). And "[n]ot all seizures amount to 'custody'; a seizure is a necessary, but not sufficient, condition." *Id.*

As to this second element, "[a]n individual's subjective belief about his or her status generally does not bear on the custody analysis." *Id.* And the law enforcement official's own perceptions bears on the custody analysis "if they are conveyed, by word or deed, to the individual being questioned, but only to the extent they would affect how a reasonable person in the position of the induvial being questioned would gauge the breadth of his or her freedom of action." *Id.* (quotation marks and citations omitted).

Relevant considerations include (1) the interrogation's duration; (2) its location (*e.g.,* at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.  *Id.* (quoting *United States v. FNU LNU*), 653 F.3d 144, 153 (2d Cir. 2011)) (cleaned up).

"[E]xamin[ing] the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials," *Taylor*, 745 F.3d at 23 (internal citations and quotations omitted). Mr. Mamadjonov was not in custody, when interviewed by law enforcement at his home.

First, "[c]ourts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is in custody." *Faux,* 828 F. 3d at 135-36 (collecting decisions both inside and outside of the Circuit ).² Here, the agents did inform Mr. Mamadjonov that he was not under arrest, and also suggested that the interview did not need to take place at his home. *See* Supp. Hearing Tr. at 41-42 ("We offered a Dunkin Donuts. I think we offered the garage, New Britain Police Department, or any place of his choosing.") As a result, this is not a basis for finding Mr. Mamadjonov to be considered in custody at his home. *See* United *States v. Gaynor*, No. 3:06CR86CFD, 2007 WL 1875651, at *3 (D. Conn. June 28, 2007) (finding not to be in custody where "[t]he Agents asked Gaynor to suggest a place to talk instead of ordering him to a particular location.") (citations omitted).

Second, while Mr. Mamadjonov argues that there were numerous agents searching his home, that still does not equate to custody. *See* Def. Ex. 1, ECF No. __ ("There were at least 20 agents."); *see, e.g.*, *United States v. Crooker*, 688 F.3d 1, 11-12 (1st Cir. 2012) (explaining that although "numerous officers" were "present inside and around Crooker's

---

² In particular, the Second Circuit in *Faux* relied on its earlier decisions in *United States v. Badmus*, 325 F.3d 133 (2d Cir. 2001), *United States v. Mitchell*, 966 F.2d 92 (2d Cir. 1992), and *Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989). In doing so, the court focused on whether the law enforcement officials informed or otherwise indicated to the suspects that they were not under arrest and were free to leave. *See Faux*, 828 F.3d at 136 (citing *Badmus* where it found "that a reasonable person would have understood that he or she was not in custody" because "the agents informed the defendant and his wife that they were not under arrest and could ask the agents to leave at any time," 325 F.3d139, and citing to *Campaneria,* where it declined to find that the statements were made in custody because "the officers had not physically or verbally indicated to [defendant] that he was not free to leave," 891 F.2d 1020 n.1).

11

house, Crooker [was] not 'in custody' where no more than two agents were in direct conversation with Crooker at one time").

As Mr. Mamadjonov argues, he was unable to move freely within his own home, he along with his family members were allowed to move with an agent. Def. Ex. 1 ("I was allowed to see my children and go to the bathroom 2-3 times during this time, always with agents present, including the bathroom."). And that does not constitute being in custody. *See Faux,* 828 F.3d at 136 ("The mere fact that Ross was told he would be accompanied by an IRS agent when he moved about the restaurant did not place him in custody within the meaning of Miranda.") (citations omitted).  Overall, based on this record and the appliable caselaw in this Circuit, Mr. Mamadjonov was not in custody during the interview at his home on November 20, 2019, and *Miranda* warnings were not required.[3]

As to the statements made on November 21, 2019, when Mr. Mamadjonov expressly waived his *Miranda* rights, these statements also are admissible. Indeed, other than preserving the argument that now binding Supreme Court precedent may have been wrongly decided, Mr. Mamadjonov concedes that "[t]he Supreme Court has rejected the proposition that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." Mot. to Supp. at 11 (citing *Oregon v. , Elstad*, 470 U.S. 298, 312 (1985)) (internal quotations omitted). As a result, the statements made by Mr. Mamadjonov at the FBI Office in New Haven on November 21, 2019 also are admissible.

---

[3] The Court notes Mr. Mamadjonov's heavy reliance on a case not only not within this Circuit, but one issued years before the Second Circuit's ruling in *Faux*, among other things. Given those circumstances, and the facts here, the Court sees no reason to adopt this ruling as dispositive, or even sufficiently probative, of the issues in this case.

Finally, Mr. Mamadjonov argues that there should be additional testimony and evidence to allow the Government "to produce the SA Litowitz's Operations Order" and to allow "further cross- examination of SA Litowitz as well as through Supervisory Special Agent Andrew Klopfer." Suppl. Memo. at 1. The Government concedes and has now provided the SA Litowitz's Operations Order. *See* Sealed Exhibit To Reply Memorandum, ECF No. 155 (Jan. 06, 2023).

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ( internal citations omitted). But, within the Operations Order, there is no language to support Mr. Mamadjonov claims as to why the agents interviewed Mr. Mamadjonov on November 20th and November 21st. *Id.* at 10. More importantly, the Operations Order only reveals what law enforcement officials intended to do on that day, not what they purportedly actually did. *Cf. United States v. Schaffer*, 851 F.3d 166, 171 (2d Cir. 2017) ("[T]he District Court held a suppression hearing, at which [the] Agent []attested to the facts [] and the District Court found his testimony credible."). And as the Government notes "none of it is relevant to any material issue in dispute, and no purpose would be served by hearing further testimony on any of it." *Id.*

Indeed, as to testimony from Special Agent Klopfer, Mr. Mamadjonov has not shown how this testimony would alter the Court's analysis regarding custody and the admissibility of Mr. Mamadjonov's statements to the FBI agents on November 20, 2019. While any such testimony might provide more of an understanding of "the totality of all the surrounding

13

circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials," *Taylor*, 745 F.3d at 23 (internal citations and quotations omitted), the potential concerns raised by Mr. Mamadjonov regarding any alleged actions by Special Agent Kopfler do not generally fall within the "relevant considerations" held to be critical to the determination of custodial status. *See Faux*, 828 F.3d at 135 (Relevant considerations include (1) the interrogation's duration; (2) its location (*e.g.,* at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.) (citations omitted) (cleaned up). And, to the extent that this testimony is intended to confirm the testimony of Agent Litowitz of the alleged "bad cop routine" utilized by SA Klopfer, the alleged "bad cop routine" is described as SA Klopfer "repeatedly [telling] [Mr. Mamadjonov] that [Mr. Mamadjonov] should be telling the truth and that [Mr. Mamadjonov] needs to tell the truth," Supp. Hearing Tr. at 102, and any further testimony would be cumulative. As a result, there is no need for SA Klopfer to provide testimony.

Accordingly, the Court will deny Mr. Mamadjonov's motion to suppress, and further proceedings on this motion are not necessary.[4]

---

[4] Of course, nothing in this ruling precludes Mr. Mamadjonov from raising related evidentiary issues at trial.

## IV. CONCLUSION

For the reasons discussed above, the motion to suppress is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of January, 2023.

    /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE