UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>– v. –<br><br>SIDIKJON MAMADJONOV,<br><br>　　　　　　　　　　Defendant. | No. 3:18 Cr. 34 (VAB)<br><br>February 8, 2023 |

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States of America, through undersigned counsel, respectfully submits this Government's Trial Memorandum to address issues that may arise at trial.

**Background**

**A.**   **The Government's Witnesses and Exhibits**

The government's current list of proposed witnesses and exhibits is attached. *See* Appendix ("A") 1.

**B.**   **Stipulated Testimony and Other Agreements**

The parties have agreed to stipulate to the testimony of FBI Digital Forensic Examiner Emanuel Hatzikostas and FBI Special Agent and Forensic Examiner Jonathan Boyer, who were responsible for extracting data from devices that were seized from Mamadjonov's residence pursuant to the search warrant executed on November 20, 2017. The parties have also agreed to stipulate to the testimony of FBI Special Agent Christopher Earley, formerly an FBI Staff Operations Specialist, concerning the authenticity of a WhatsApp posting associated with telephone number (718)307-8372 [GX 210].

The parties have also agreed that the following exhibits have been authenticated and qualify as business records pursuant to Rules 902(11) and 803(6), respectively, of the Federal Rules of Evidence: Exhibits 102, 104, 201, 203, 204, 207, 301, 302A-E, and 303A-D.

The parties have also agreed that the trial exhibits will be edited to not show redaction marks.

The parties anticipate reaching agreement with respect to the accuracy of transcriptions and translations, thereby obviating the need for testimony from translators.

## ARGUMENT

**I.    Proposed Testimony of a Cooperating Witness Concerning Material Support by Mamadjonov, Including Phone Calls Mentioning Mamadjonov, Is Admissible**

During the pretrial conference on January 25, 2023, the Court heard argument from the parties concerning, *inter alia*, evidentiary issues relating to the international terrorism enhancement. During the colloquy, the Court suggested two categories of evidence that could potentially provide an adequate nexus between a charged false statement and application of the sentencing enhancement: (1) "if the government was able to prove that the reason that the person was lying was because that person was themselves involved with the terrorist activity," or (2) the person was "concealing activity that the person knew was terrorist activity." Transcript of Motion Hearing, dated. Jan. 25, 2023 [Dkt No. 189], at 27-28.

The government respectfully maintains the arguments that it has previously made with respect to the admissibility of evidence in order to prove the terrorism enhancement. *See* Government's Memorandum of Law in Response to Defendant's Pretrial Motions, dated Dec. 23, 2022 [Dkt No. 145], at 23-34. The government further submits that, should the Court adopt the analysis suggested at the January 25 hearing, the evidence relating to the February 19, 2015

phone calls and other evidence of Mamadjonov's own involvement in terrorist fund raising, as described more fully below, should be admissible in support of the terrorism enhancement.

A.     **Relevant Facts**

The government plans to offer the testimony of two cooperating witnesses, both of whom have pled guilty in the Eastern District of New York to, *inter alia*, providing material support to terrorism. Prior to their testimony, the government expects to establish the following:

- On May 27, 2013, Mamadjonov traveled on a one-way ticket to Turkey, with several family members and $37,000 cash.

- On June 11, 2013, Mamadjonov returned to the United States.

- On the date of his outbound travel, Mamadjonov told the CBP officer that the purpose of the trip was for sightseeing and a vacation. After returning to the United States, Mamadjonov made several conflicting statements to the FBI concerning the purpose of his travel and the reason for his return.

- On or about July 2, 2013, Mamadjonov received a DHL package containing, *inter alia*, an iPhone 4.

Both cooperating witnesses are expected to provide testimony concerning the iPhone. In addition, one of the cooperating witnesses ("CW-1") is expected to provide testimony about the actual purpose of Mamadjonov's trip to Turkey and the reason for his unexpected return. Specifically, following Mamadjonov's return from Turkey, CW-1 was at a party at Mamadjonov's residence celebrating the birth of a child. During the party:

- Mamadjonov showed the iPhone 4 to CW-1 and others. Mamadjonov played several videos for the group, including: (i) a video of four men sitting and cleaning guns; (ii) a video of Saidjon on a rooftop with gun fire in the background, where Saidjon said, "We are here"; (iii) a video of Saidjon and others who appeared to be in training; and (iv) a video of Saidjon after he had been killed.

- When one of the members of the group stated that Mamadjonov should not have returned from Syria, Mamadjonov responded that he was instructed by the commander ("emir") to return to the United States, to continue his car business, and to send money to Syria, instead of staying in Syria and fighting. Mamadjonov further stated that he had purchased a weapon in Syria, which he left with the emir.

>Mamadjonov further stated that the emir used the word "dawla," which CW-1 understood to mean the Islamic State or ISIS.

CW-1 is also expected to testify to the following:

- On a different occasion, Mamadjonov contacted CW-1 to solicit funds to purchase an ambulance for the emir's group in Syria. Mamadjonov subsequently told CW-1 that he had sent money overseas to ISIS.

- On or about February 19, 2015, CW-1 spoke by phone on two occasions with a third party, whom CW-1 will identify as Azizjon Rakhmatov. During the first call, CW-1 and Rakhmatov discussed buying a "bus ticket" for another individual. During the second call, CW-1 asked Rakhmatov to "let brother [Sidik] and others know about that issue." Rakhmatov asked CW-1 to do so and warned CW-1 to "be careful," asking if CW-1 was "aware about a visit of two guys." CW-1 will testify that these conversations were about funding the travel to Syria of an individual then in the United States, that "Sidik" was a reference to Mamadjonov, and that Rakhmatov was warning CW-1 that Mamadjonov had been visited (*i.e.*, interviewed by) two FBI agents.

The government plans to offer audio recordings and transcripts of the two phone calls on February 19, 2015.

### B. The Testimony and Phone Calls Offered Through CW-1 Are Admissible

The government believes that there is no dispute as to the admissibility of testimony from the two cooperating witnesses concerning the iPhone 4 or statements made by Mamadjonov about the contents of the iPhone 4. As to other evidence from CW-1, including the phone calls on February 19, 2015, the government respectfully submits that the evidence is relevant and highly probative.

Specifically, the evidence is relevant to establishing, with respect to Counts One through Three, that the false statement offenses involved international terrorism, and with respect to Count Four, that Mamadjonov knew his brother was associated with a terrorist organization.

As to Counts One through Three, as suggested during the motions hearing, in determining whether a false statement offense "involves" international terrorism, it is relevant

4

whether the declarant knew of the terrorism activity under investigation. Here, Mamadjonov's meeting with the emir in Syria is highly probative of the fact that he knew his brother Saidjon was associated with a foreign terrorist organization. Mamadjonov's own involvement in fund raising – and being sent back by the emir for that purpose – is likewise probative of the fact that Mamadjonov knew what the organization was and what the organization was doing. In other words, this evidence shows that Mamadjonov knew what his brother was doing and whom he was doing it with – evidence that is very relevant to the issue, disputed by Mamadjonov, of whether the offense involved international terrorism.

As to Count Four, the government respectfully submits that the evidence is relevant, for largely the same reasons, to the question of whether Mamadjonov knowingly made a false statement in denying that he had ever "been a member of or in any way associated (either directly or indirectly) with a terrorist organization." Evidence that Mamadjonov met with the emir and supported the organization is probative of Mamadjonov's knowledge that he had associated with a terrorist organization, even if only indirectly though his brother.

For the foregoing reasons, and the reasons previously set forth by the government, the testimony from CW-1, including the phone calls, is admissible.

## II. Proposed Testimony Concerning the Initial Tip Is Res Gestae, as it Concerns the Origin of the FBI Investigation, and Is Not Hearsay

### A. Relevant Facts

The international investigation of Sidikjon and Saidjon Mamadjonov originated from a tip from a source. As a result of the government's Motion for Protective Order Pursuant to Section 4 of the Classified Information Procedures Act and Fed. R. Crim P. 16(d) and 26.2, dated September 20, 2020 [Dkt No. 90], and Supplemental Motion for a Protective Order, dated Sept.

13, 2022 [Dkt No. 117], the Court ordered an unclassified substitution for that tip (the February 2014 tip):

> In February 2014 [the source] reported that Saidjon and Sidikjon were both killed in the summer of 2013 in Syria while fighting on behalf of al- Qa'ida. While the FBI's investigation established that Sidikjon returned to the U.S. on 6/11/2013, the FBI to date has not been able to confirm or refute the allegations with respect to Saidjon.

The government provided this unclassified substitution to Mamadjonov by redacting the source of the information from the FBI electronic communication in which it appeared. A 43. *Cf.* A 42. The government plans to call Supervisory Special Agent Alan Reiner to testify about the tip and the onset of the international terrorism investigation of Mamadjonov and his brother.

  **B.**  **Testimony Concerning the Tip Is Admissible**

  The tip is not hearsay, because the government is not introducing it for the truth of the matter. Rather it is introducing it to explain to the jury why the FBI took the investigative steps that it took as to Mamadjonov and his brother Saidjon. *See United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994) (a "background" statement is admissible if the non-hearsay purpose of the out-of-court statement is relevant and if the probative value of the evidence for its non-hearsay purpose outweighs the danger of unfair prejudice); *United States v. Hamilton*, 538 F.3d 162, 170-71 (2d Cir. 2008) (testimony of special agent that he had learned where defendant was living was not hearsay, but for the non-hearsay purpose of showing the government's investigative efforts to find the defendant following his failure to appear in court).

  The Second Circuit has a balance test to determine whether such evidence can be admitted. Such background information may be admitted if "(1) 'the non-hearsay purpose by which the evidence is sought to be justified is relevant,' and (2) 'the probative value of this evidence for its non-hearsay purpose is [not] outweighed by the danger of unfair prejudice

6

resulting from the impermissible hearsay use of the declarant's statement.'" *United States v. Ryan,* 303 F.3d 231, 252 (2d Cir. 2002) (quoting *Reyes,* 18 F.3d at 70).

The *Reyes* court held the agent's state of mind, though an important link in the prosecution's narrative, was not relevant to the defendant's guilt. *Id.* at 71. Further, the statements were prejudicial because they addressed the most important disputed issue at trial, directly implicating the defendant in the crime. *Id.* In *Ryan*, 303 F.3d at 252, the Court excluded background evidence noting that "even if the testimony was relevant, it should have been excluded under a standard Fed. R. Evid. 403 probative versus prejudice balance." The testimony addressed the central issue to the case – the circumstances under which Ryan was initially charged. Prejudice inured from the fact that the background evidence relayed information from an unreliable confession, in an effort to explain why Ryan was initially charged and eventually arrested. The court noted:

> The testimony was only relevant if we assume its truth—that Peter Q. accused Ryan—which we cannot do. Because the testimony is only relevant to the very purpose for which the jury cannot consider it, it is not admissible testimony under the background exception.

*Id.*

Central to both *Reyes* and *Ryan* was that the prejudice inured from the fact the background evidence related to the very crime charged. Here the February 2014 tip does not present the same potential for prejudice, as it does not implicate Mamadjonov in the crime charged. Had the tip been true it would have implicated him in providing material support to the designated foreign terrorist group al-Qaida. Here Mamadjonov is charged with making materially false statements to the FBI in an offense involving international terrorism – false statements that he made to conceal the fact that his brother Saidjon had,

7

in fact, died in Syria by the summer of 2013, fighting for a designated foreign terrorist organization.

Moreover, the tip was wholly mistaken in its reporting that Mamadjonov had died fighting in Syria for al-Qaida. Among the first things the jury will hear from the case agent who responded to the tip, was that he quickly learned that it was incorrect as to Mamadjonov. Further, the February 2014 tip is important to the jury's understanding of why the FBI investigated both Mamadjonov brothers, and the materiality of Mamadjonov's lies. Certainly, the FBI learned very early on that the tip was incorrect as to Mamadjonov, but it was unclear whether the February 2014 tip correctly reported his brother Saidjon's actions. In the absence of truthful responses from Mamadjonov, they were consistently stymied in their ability to confirm or refute the February 2014 tip as to Saidjon.

Nor is the fact that the tip indicated that the designated foreign terrorist organization al-Qa'ida prejudicial. Whether the reference to al-Qa'ida is the product of the tipster's ignorance, imprecision, or was in fact fully intended, there is no harm in the tipster identifying the designated foreign terrorist organization as al-Qa'ida. That a designated foreign terrorist organization was involved is probative of the element that Mamadjonov's false statement offense involved international terrorism. Even though Mamadjonov eventually told the FBI that his brother died fighting for al-Nusrah Front, and not al-Qa'ida, this is a distinction without a difference for purposes of the international terrorism element. Indeed, as Matthew Leavitt will testify, at the time that Saidjon traveled to Syria in 2013 to engage in violent jihad, al-Nusrah Front and ISIS were subject to the same FTO designation as aliases of their forebearer, al-Qa'ida in Iraq. *See* A 36-41 (Levitt Expert Report).

Under these circumstances, the government submits that the jury will be capable of follow a limiting instruction, and not treat the evidence as proof of the truth of the February 2014 tip. *Cf. Reyes*, 18 F.3d at 69. The February 2014 tip should be admitted as relevant background evidence.

### III. A CBP Record of Mamadjonov's Travel Is Admissible As a Business Record and as Mamadjonov's Own Statement

#### A. Relevant Facts

The government proposes to offer a U.S. Customs and Border Protection, TECS Secondary Inspection Report, *see* A 4 [GX101B], pursuant to a certification that meets the requirements of Fed. R. Evid. 803(6) and 902(14). The report relates to a secondary inspection of Mamadjonov from May 27, 2013, when he was leaving the country with his wife, mother, and sister on a one-way trip to Istanbul.

In a section labeled Comments History, the CBP officer entered the following:

> Pax was traveling to Turkey for 1 wk for sightseeing and then is traveling to Uzbekistan for vacation. Pax was traveling with his wife Ahkmedova, Khilola, . . . and his mother, Mamadjonova, Mayramdjan. pax stated he works as a NYC taxi driver and as an Auto dealer through Autotec. Pax filled out Fincen form for $37,000 usd.

#### B. The CBP TECS Record Is Admissible

The parties agree that the TECS record, other than the Comments History, is not inadmissible hearsay, because it is a business record relating to the travel of Mamadjonov and his family members.

Mamadjonov has indicated he may object to the entry in the Comments History. Were he to do so, the objection would be ill-founded. The Comments History reflects what the CBP officer learned from Mamadjonov. All but the last sentence is an admission, and not hearsay.

9

*See* Fed. R. Evid. 801(d)(2). The last sentence – "Pax filled out Fincen form for $37,000 usd" – is not an admission; however, it too is not hearsay. The government will not offer this for the truth of the matter, but solely to demonstrate to the jury why the case agent proceeded to obtain records related to these funds and investigated to see if there were records of other financial transactions. *See* Fed. R. Evid. 801(c)(2). *See, e.g.*, *Hamilton*, 538 F.3d 170-71; *Reyes*, 18 F.3d 70-71. With a limiting instruction, there is little risk of prejudice, particularly when the agent was later able to obtain the FINCEN records reflecting that Mamadjonov had completed a Currency and Monetary Instruments Report, *see* A 22-24 [GX104], the "Fincen form" referenced in the Comments History of the Secondary Inspection Report.

**IV.    The Google Talk Records of Saidjon and Email Messages Sent to Saidjon Can Be Authenticated and Are Admissible**

    **A.    Relevant Facts**

The government plans to offer non-content records maintained by Google for an account identified as smbunyod.inc@gmail.com subscribed to by Mamadjonov's brother, Saidjon. A 25 [GX205]. It also will offer the contents of certain communications in a Gmail account identified as starbyziko@gmail.com subscribed to by Azizjon Rakhmatov, aka Abdulaziz Rakhmatov ("Rakhmatov"). A 31 [GX206].

The records related to Saidjon Mamadjonov's Gmail account include non-content records of Saidjon's communications using Google Talk – an application that enables voice communications over the internet. *See* A 25 [GX205]. These show that Saidjon was in contact with Mamadjonov on January 19, 2013, just prior to his departure, and January 20, 2013, after arriving in Istanbul. They further show the two were in contact sporadically, between February and May 2013 – on February 25th and March 19th. The Google Talk records show the last communication between Mamadjonov and his brother, on May 19th – the last date Saidjon

Mamadjonov used Google Talk. Additionally, other records related to Saidjon Mamadjonov's Gmail account, *see* A 31 [GX206], show that in 2012, he was in contact with Rakhmatov, who was convicted of conspiring and attempting to provide material support to designated foreign terrorist organization ISIS.

The three emails from the starbyziko@gmail.com account are between Rakhmatov, who is identified by name in the headings, *see* A 31 [GX206], and Saidjon Mamadjonov in April and May of 2012. The emails include attachments which are photos of Saidjon Mamadjonov and Rakhmatov, *see* A 32, and Saidjon with Dilshod Khusanov, *see* A 34, also convicted of conspiring to provide material support to designated foreign terrorist organizations ISIS and al-Nusrah Front.

      **B.**      **The Google Talk and Email Records Relating to Saidjon Are Admissible**

To establish authenticity of evidence under Fed. R. Evid. 901, the key question is whether "the matter in question is what its proponent claims." *See, e.g., United States v. Al-Moayad,* 545 F.3d 139, 172 (2d Cir. 2008) ("[t]he bar for authentication of evidence is not particularly high. . . ."). The parties agree that the documents in GX205 and 206 meet the authentication requirements of Fed. R. Evid. 902(14). As the Declaration of SSA Tracey Minnich, of the Data Intercept Technology Unit ("DITU") of the FBI's Operational Technology Division explains, DITU has pre-existing relationships with providers of electronic communications for the delivery of data responsive to court-authorized compulsory process. Upon being served with a court order, it is the service provider, here Google, which performs the search of records related to the account(s) named in the order and delivers electronic files containing records responsive to the order through an agreed upon method to the FBI. *See* Minnich Declaration*.* at ¶ 3. (A 44-47).

Here the provider, Google Inc., received a court order seeking non content records related to email account smbunyod.inc@gmaiI.com, and DITU received a return from Google Inc. on

11

December 3. 2014. Google also received a court order for records, including content of communications related to an account starbyziko@gmail.com, which DITU received a return from Google Inc. on January 29, 2016.  DITU processed the returns as described above. *Id.* at ¶ 7.

To establish that the responsive documents are business records within the meaning of Fed. R. Evid. 803(6), the government intends to call a qualified witness from Google to establish that the electronic records forwarded to the DITU in response to the two different court orders addressed in the Minnich Declaration are the business records of Google, admissible pursuant to Fed. R. Evid. 803(6).  The witness, Cathy McGoff, has worked for Google for over 15 years, predating the court orders that were issued to Google here.  Among her duties at Google, Ms. McGoff manages the team that processes the legal requests that Google receives for user data.  She is intimately familiar with Google's record keeping practices and procedures and, as such, has testified as a custodian of records for the company.[*]

Ms. McGoff would testify as to Google's standard practice when it receives court-ordered compulsory process for either content or non-content information for a Google account holder. That practice involves reviewing the order, ensuring that it is complete as to form and execution, and, if so, taking a snapshot of the electronic records responsive to the order, downloading the data into an "mbox" format, and providing that data to the FBI's DITU through the electronic means.  She would testify that Google adhered to this standard practice in responding to the court-ordered compulsory process at issue here.  She would further testify that Google's business practice, when retrieving records responsive to court-ordered compulsory process is analogous to

---

[*] In one such instance, *United States v. Farekh,* 15-CR-268, in 2017, Ms. McGoff laid the foundation to admit records of email accounts obtained pursuant to court-ordered compulsory process issued to Google

its practice when receiving other forms of compulsory process (such as a grand jury subpoena, 2703(d) order, or search warrant).

Her testimony would conclude addressing the elements of the business records exception to the hearsay rule under Fed. R. Evid. 803(6). She will testify that the responsive records were: 1) made at or near the time by – or from information transmitted by – someone with knowledge; 2) they were kept in the course of Google's regularly conducted business activities; and 3) making such records was a regular practice of that activity. *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014).

Ms. McGoff is a qualified witness within the meaning of Fed. R. Evid. 803(6) even if she does not have personal knowledge of the responsive documents received by DITU. A witness need not be a custodian or have personal knowledge of the actual creation of the document to be "qualified" within the meaning of Rule 803(6). *See, e.g., United States v. El Gammal*, 831 F. App'x 539, 543 (2d Cir. 2020)(citing *Komasa*, 767 F.3d at 156 (explaining that a witness "need not have personal knowledge of the actual creation of the document")); *see also, e.g., United States v. Jenkins*, 345 F.3d 928, 936 (6th Cir. 2003) ("In order to be considered to be an 'otherwise qualified witness' under Rule 803(6) '[a]ll that is required of the witness is that he or she is familiar with the record keeping procedures of the organization.' " (internal citations omitted)).

As such, the records received from Google in response to the court-ordered compulsory process addressed in the Minnich Declaration and identified in the table annexed thereto are admissible as the parties agree they are properly authenticated, pursuant to Fed. R. Evid. 902(14), and, based upon the anticipated testimony of Google's custodian of records, fall within the business records exception to the hearsay rule.

## V.      Mamadjonov's Prior Statements Would Be Hearsay if Offered by Him

The government respectfully submits that Mamadjonov may not offer his own out-of-court statements, either during the cross examination of government witnesses or in his case in chief. Such statements would constitute hearsay.

While the government is "free to introduce" a statement by Mamadjonov as an admission by a party opponent, Mamadjonov has "no right to introduce it on his own." *See United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003). The government's excerpts do not violate the rule of completeness, *see* Fed. R. Evid. 106, as they do not distort the meaning of Mamadjonov's statements nor exclude information that is "substantially exculpatory" of the defendant. *Yousef*, 327 F.3d at 154.

In this case, the government expects to offer testimony concerning statements made during interviews of Mamadjonov, as well as transcripts and audio from parts of a recorded interview conducted on November 21, 2017. Unless Mamadjonov can show that additional portions of his interviews must be included to satisfy the rule of completeness, the government respectfully submits that Mamadjonov may not offer his own hearsay statements during the cross examination of government witnesses or during his case in chief.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

*/s/ Edward Chang*

EDWARD CHANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct26472
157 Church Street, 25th Floor
New Haven, CT  06510
T: (203)821-3826  E: Edward.Chang@usdoj.gov


STEVEN WARD
TRIAL ATTORNEY
Counterterrorism Section, National Sec. Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
T: (202)305-2461  E: Steven.Ward@usdoj.gov

### CERTIFICATE OF SERVICE

   I hereby certify that on February 8, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Edward Chang*
EDWARD CHANG