UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL NO 3:18cr34(VAB) |
| v. | : | |
| | : | |
| SIDIKJON MAMADJONOV | : | June 26, 2024 |

**MEMORANDUM IN AID OF SENTENCING**

*"Such people must be shot in the head.  If necessary, I'll shoot them myself."* [1] *- President Islam Karimov referring to Muslims.  Speech to Parliament, broadcast over Uzbekistan radio. May 1, 1998, Tashkent.*

*Map depicting Uzbekistan within former USSR*



## I.    Sidikjon Mamadjonov's History and Characteristics

Sidikjon Mamadjonov ("Sidik") was born in Tashkent, Uzbekistan in August 1986 at a time and place that we now know was the twilight of the Soviet Union and the bourgeoning of state-sponsored Muslim persecution.  He is now almost 38 years old.  He and his wife, Khilola Akhmedova, along with their four children, live with his mother, Alia Usmanova, in Broadbrook, Connecticut.

Considering on his own life history, as described in detail below, throughout this case, Sidik has reflected on his experiences versus those of his children.  Sidik is so happy for his

---

[1] Reuters, May 2, 1998, cited in AAP Information Services Pty. Ltd., AAP Newsfeed, May 3, 1998, via Human Rights Watch.

children, because in Uzbekistan, the smallest and most marginal differences would foster ubiquitous hatred and racism. Sidik compared this to his daughter who, at school, plays with students of all different races, and specifically her best friend who is white. This brought a very genuine smile to Sidik's face, and exemplified how much he loves his children.

A.   Sidik's parents were ethnic, religious, cultural, and class minorities.

Mr. Mamadjonov's father, Sodik Mamadjonov, was born in May 1964 in Leninobod, Tajikistan (now known as Khujand), a mountainous region known for the prevalence of sheep and the riding of donkeys. His mother, Alia Usmanova, was born in October 1964 in a rural village in Spitamen, in the northern region of Tajikistan. Sodik and Alia met when they were studying at a musical college in Leninobod. At the time, Alia played piano, and Sodik sang. After they got married in 1982/83, Sodik served in the army for two years, stationed in modern-day Belarus and Ukraine. When he returned from military service, he and Alia moved to Tashkent, the capital city of Uzbekistan where Sodik applied to the Culture & Art University (Uzbekistan State Institute of Arts and Culture). Sodik worked as an actor and a singer in Tashkent. He was featured in small roles for a variety of movies and was also hired to sing at many weddings.

B.   Sidik experienced racism, classism, and ethnic persecution from birth.

When Sidik was born in 1986, he experienced the world as an individual in the ethnic, cultural, and religious minority. He and his family experienced racism and classism from neighbors, schoolteachers, peers, and police in the city of Tashkent. In school, other students openly made racist and classist comments to Sidik because of his religious and cultural background and due to his origins in the countryside. Peers bullied and harassed him. On one occasion, Sidik went to a friend's house, and the friend's mother threw shoes at him and grabbed him in anger because he "looked inferior" and she believed he was a "second-class citizen."

Although he was academically strong, Sidik's teachers nevertheless discriminated against him by placing him in the back of the classroom.  The front of the classroom was reserved for students with roots originating in the city of Tashkent.  Furthermore, in First Grade, students are separated into different classes assigned letters A-E.  Class A, for example, would be composed of students belonging to wealthy families, whose parents donated to the school.  Class E, on the other hand, was populated with students who immigrated to the city, and were generally very poor.  Interestingly, however, Sidik was placed in Class A because he was excelling at school at this time.  This placement, however, was ultimately revoked before the year's end when his teacher kicked him out, and he was placed in Class E because of his origin.  Sidik remained in Class E until he graduated from high school.

C. The dissolution of the Soviet Union – far from yielding the promise of religious freedom -- gave way to State-sponsored persecution, detention, and torture of Muslims in Uzbekistan.

Right around this time, in 1991, Uzbekistan declared independence from the Soviet Union.  The dissolution of the Soviet Union meant that, in theory, Muslim people in Uzbekistan, like the Mamadjonov family, could freely practice their religion.  During this period of relative religious freedom, Sodik Mamadjonov acted in a short film about Islam.  The film featured Imams and promoted the idea of religious freedom.  Within a few short years, however, police began to arrest and persecute Muslims.

Islam Karimov served as the President of Uzbekistan, and its predecessor state, the Uzbek Soviet Socialist Republic, from 1989 up until his death in 2016.  President Karimov's regime has been characterized as an archetypal post-Soviet police state, riddled with corruption and brutality.[2]  Karimov used State-sponsored violence to quash potential uprisings.  Karimov viewed the religion

---

[2] Nate Schenkkan, ISLAM KARIMOV AND THE DICTATOR'S PLAYBOOK.  *Foreign Policy*, August 30, 2016.

of Islam as the most potent threat to his rule, a notion stemming from political uprisings in Tajikistan in 1992.[3]  In Tajikistan, these political outbursts culminated in a civil war between Soviet-era, Russian-aligned elites against pro-democracy activists and advocates of an Islamic state.  In years following this civil war in Tajikistan, President Karimov continued to attribute the strict laws placed on religious freedom to Tajikistan, stating that if rigid anti-fundamentalist measures had not been taken ,"Tajikistan will come to Uzbekistan tomorrow."[4]  Karimov outlawed political opposition, and the independent practice of Islam.

### 1.  The Uzbek government used the law to suppress religious freedom.

In 1993, the Uzbek government implemented legislation that resembled soviet-era laws which restricted the right to practice religion.  These laws tasked two governmental bodies, the Muslim Spiritual Board and the Cabinet of Ministers' Committee on Religious Affairs, with defining acceptable Islamic practices, and weeding out anyone who refused to conform to these practices.[5]  Furthermore, they were tasked with registering Mosques, selecting and removing Imams, and dictating the contents of sermons.  All these actions taken by President Karimov created a form of state-sponsored Islam.  In practice, the Karimov regime maintained centralized control over all religious affairs, and ruthlessly persecuted any person that practiced religion outside of this framework.  According to French scholar Olivier Roy, the government supported Islam only so far as it functioned as a vehicle for national pride.  Moreover, the government strongly opposed Islam when its priority is a cause other than promoting the Uzbek state.[6]  People

---

[3] CREATING ENEMIES OF THE STATE: RELIGIOUS PERSECUTION IN UZBEKISTAN." *Human Rights Watch*, March 29, 2004.
[4] As quoted in Uzbek radio second program, Tashkent, May 1, 1998, English translation in BBC Monitoring, May 5, 1998.
[5] CREATING ENEMIES OF THE STATE: RELIGIOUS PERSECUTION IN UZBEKISTAN.
[6] CRACKDOWN IN THE FARGHONA VALLEY: ARBITRARY ARRESTS AND RELIGIOUS DISCRIMINATION. *Human Rights Watch.* May 1, 1998.

defying this standard of state-sponsored Islam were deemed "Wahhabis,"[7] regardless of whether they adhered to Wahhabism.  Law enforcement began to identify "Wahhabis" as people practicing Islam privately, praying five times a day, calling on other Muslims to declare their submission to God and believe in the Prophet Muhammad, shunning alcohol, observing religious holidays, and learning Arabic to study the Koran in its original language.  The government also came to identify people who grew beards or wore hijabs as "Wahhabis."[8]  Imams were also targeted by law enforcement for their refusal to praise President Karimov during their sermons, which ultimately led to the strategic targeting of those Imams, as well as anyone who attended their sermons.  This rise in the surveillance of independent Muslims contributed to arrest patterns for years to come. The Karimov regime ultimately created a list of thousands of people that the state marked as "enemies" of the government.[9]

## 2.   The Uzbek State used the criminal legal system to prosecute Muslims.

The murder of multiple police officers in 1997 led to a rise in human rights abuses committed during a reactive "crackdown" on Muslim people specifically.  Human Rights Watch conducted a study from March 14 to March 21, in 1998, in Tashkent, Namangan, and Andijan, which revealed the following abuses by the Karimov regime:

> beatings and threats by arresting officers, particularly in the police precincts and during interrogations; fabricating evidence, particularly police planting small amounts of narcotics, weapons, or bullets to falsify criminal charges; failing to release a prisoner after his sentence has been served; and violations of freedom of religion including forcing pious Muslims to shave off beards or expelling them from educational institutions.[10]

---

[7] "Wahhabism" is a strictly orthodox Sunni Muslim sect founded in the 1700s which advocates a return to the early Islam of the Koran and Sunna, and its fundamentalism is sometimes conflated with extremist or violent views.
[8] CREATING ENEMIES OF THE STATE: RELIGIOUS PERSECUTION IN UZBEKISTAN.
[9] Ibid.
[10] CRACKDOWN IN THE FARGHONA VALLEY: ARBITRARY ARRESTS AND RELIGIOUS DISCRIMINATION.

The Karimov government arrested thousands of innocent Muslim people, starting with the most prominent Imams in the state.  One such figure, Imam Obidkhon Kori Nazarov, faced persecution from the state after refusing to serve as an informant for the National Security Service ("NSS", formerly the KGB).[11]  Nazarov's unwillingness to cooperate with the NSS implicated his family members, and anyone that had attended his sermons.  Uzbek authorities made accusations that Nazarov was involved in terrorist and extremist activities, and used these assertions to incarcerate two assistants, three brothers, and his wife.[12]

Further ramifications for associating with Nazarov are laid out by Human Rights Watch's report after he fled Uzbekistan:  "Following his vanishing, even a loose association with Imam Nazarov became the basis for arrests, conspiracy charges, and long prison sentences."[13]  All those people loosely affiliated with Nazarov would end up on "special police registers" and would face police persecution.  In fact, many of these men would be labeled "Wahhabis," arrested, and convicted on falsified charges of possessing narcotics or bullets.[14]

### 3.  The Uzbek State committed human rights abuses against Muslims.

The assemblance of police registers had implicated thousands of people deemed enemies of the state.  The people who were placed on these lists after attending sermons of Imams who had been disavowed by Karimov's government, suffered extreme persecution and human rights abuses following the Tashkent bombings in 1999.  Multiple bombs exploded near government buildings in Tashkent.[15]  Following these bombings, President Karimov accused Islamic "extremists" as the responsible party, justifying the widespread arrests of independent Muslims.[16]  This act of terror

---

[11] CREATING ENEMIES OF THE STATE: RELIGIOUS PERSECUTION IN UZBEKISTAN.
[12] Gulnoza Saidazimova. UZBEKISTAN: DISSIDENT IMAM REACHES SAFETY AFTER EIGHT YEARS IN HIDING. *Radio Free Europe/Radio Library*, March 16, 2006.
[13] CREATING ENEMIES OF THE STATE: RELIGIOUS PERSECUTION IN UZBEKISTAN.
[14] Ibid.
[15] Ibid.
[16] Ibid.

was met with the arrests of thousands of independent Muslims, who were subjected to severe human rights violations by local law enforcement.[17]  Police activity in the wake of the bombings has been characterized as:

> Masked officers with automatic weapons raided homes at night to seize suspects. They frequently planted drugs or bullets to prove guilt. They sometimes confiscated the Koran or other state-sanctioned religious texts as contraband or evidence of "extremism." Relatives of wanted men were taken hostage pending the suspects' appearance. Police also took relatives into custody to increase their leverage with religious detainees who refused to confess to crimes they did not commit. Police used increasingly sophisticated and brutal forms of torture, including electric shock, punctures with metal spikes, rape, and targeted beatings that would not leave marks visible when the defendants appeared in court.[18]

The victims of this abuse were ultimately charged in criminal cases for their religious affiliation to Islam.  Prosecutors argued that the defendants were involved in a vast conspiracy of Islamic extremism to overthrow the government and create an Islamic State.  The state would ultimately go on to torture these defendants, deprive them of counsel, and intimidate witnesses and relative of defendants to yield guilty verdicts.[19]

### 4.  The Uzbek State ultimately tortured practicing Muslims.

The Uzbek government authorized the use of brutal violence in order to detain people and coerce confessions.  A 2003 report from the U.S. Department of State stated:

> Although the law prohibits these practices, both police and the NSS routinely tortured, beat, and otherwise mistreated detainees to obtain confessions or incriminating information. Police and the NSS allegedly used suffocation, electric shock, rape, and other sexual abuse; however, beating was the most commonly reported method of torture. Human rights observers reported that the use of torture abated in some prisons following the January conviction of four policemen. Torture nonetheless continued in prisons, pretrial facilities, and local police and security service precincts; and the severity of torture did not decrease during the year. At the end of his visit in December, the U.N.

---

[17] Ibid.

[18] Ibid.

[19] Ibid.

Special Rapporteur on Torture concluded that the use of torture in the country was systemic.[20]

The torture of detainees has been well documented ,both in this report, and others.  Pakistani writer Ahmed Rashid writes in his book "Descent into Chaos: The U.S. and the Disaster in Pakistan, Afghanistan, and Central Asia," about Muzafar Avazov and Khusniddin Alimov (also "Olimov") who were both held in Jazlyk jail.  The two were tortured to death, and when their bodies were returned to their families, it was found that they had been forcibly drowned in boiling water.[21]

This is further corroborated in a Department of State's report which explains that:

> Both men, members of Hizb ut-Tahrir in Jaslyk prison, were badly beaten and had burns attributable to scalding water over significant portions of their bodies. Authorities did not issue a public explanation of the incident by years end. Police insisted that the men died in an altercation with two other inmates that in the course of the fight hot water from a tea caldron was spilled on them.[22]

Guards at Jaslyk prison routinely prevent prisoners from praying, fasting, or reading the Koran.[23]

The study from the Department of State further reports that prisoners who had been suspected of following extreme Islamist groups were consistently beaten and tortured worse than other criminals.  Another example of this was Imam Abdulvakhid Yuldashev, who was ultimately convicted in 2001 on charges of Islamic extremism.  It is reported that Yuldashev was the victim of beatings, and his lawyer who visited him in jail reported that his feet were "flayed."[24] Additionally, Yuldashev testified in court that investigators had burned his genitals to elicit a confession while he was in pre-trial detention.[25]

---

[20] Bureau of Democracy HUMAN RIGHTS AND LABOR. U.S. DEPARTMENT OF STATE COUNTRY REPORT ON HUMAN RIGHTS PRACTICES 2002 - UZBEKISTAN. *Refworld: Global Law and Policy Database*, March 31, 2003.

[21] Ahmed Rashid,  DESCENT INTO CHAOS: THE U.S. AND THE DISASTER IN PAKISTAN, AFGHANISTAN, AND CENTRAL ASIA. Penguin Books, 2009.

[22] U.S. DEPARTMENT OF STATE COUNTRY REPORT ON HUMAN RIGHTS PRACTICES 2002 - UZBEKISTAN.

[23] DESCENT INTO CHAOS: THE U.S. AND THE DISASTER IN PAKISTAN, AFGHANISTAN, AND CENTRAL ASIA.

[24] U.S. DEPARTMENT OF STATE COUNTRY REPORT ON HUMAN RIGHTS PRACTICES 2002 – UZBEKISTAN.

[25] Ibid.

In another instance on November 10, 2001, it was reported by the Department of State that three NSS officers tortured Musurmon Kulmurodov to death with pliers, a screwdriver, and a metal baton.  He was tortured in the presence of his mother, wife, and their two children.  The family had initially been stopped at a traffic checkpoint, and were taken into custody for suspected narcotics trafficking.  None of the officers were held criminally liable.[26]

D. Sidik experienced the fear of religious persecution first-hand.

Shortly after releasing the film on Islamic religious freedom, the police began arresting everyone that had been featured in the movie.  Sodik Mamadjonov traveled to South Korea and remained there for some time, earning money to send back to his family.  He left Uzbekistan for fear of being detained by police.  After Sodik went to South Korea, the police came to their home more and more inquiring about Sodik's whereabouts.  Police then took Sidik's mother to the police station roughly once a month.  They interrogated her about contacts with other Muslim people in their community.

This was a terrifying and formative time for Sidik and his family.  For one, their father was not at home.  For another, seeing his mother get harassed and brought to the police station frequently was terrifying.  In those moments, Sidik did not know what was going to happen, or if he would ever see her again.  There was nothing that Sidik's mother and father could do to protect their three children.   As was widely known, this tactic of harassing family members was corroborated in the Department of State's report described above.  Imam Ruhiddin Fahruddinov's wife, Rahima Akhmadalieva, was detained by police after Farruhdinov was on the run from an arrest warrant for suspicion of extremism.  Akhmadalieva was later convicted despite the state

---

[26] Ibid.

having no credible evidence she had committed a crime.[27]  Sidik and his family lived in fear of the police and legal system that were systematically persecuting Muslim people.

As a result, and due to frequent bullying and persecution, the Mamadjonov family moved multiple times during their time living in Tashkent.  The first apartment where Sidik lived for five or six years in Tashkent was next to this "garbage room" in the basement of their apartment building.  Sharing a wall with this garbage room created many significant living challenges for the Mamadjonov family.  The stench emanating from the heaps of garbage just one wall away consumed their apartment, while also attracting cockroaches and rats.  Seeing cockroaches and rats was an everyday occurrence in this apartment.  One time in particular, Sidik's mother returned to the studio apartment to find a rat trying to bite him.  On top of the presence of rodents, vermin, and stench, in addition, the neighbors hated the Mamadjonov family.

The next apartment in which the Mamadjonov family lived was a one-bedroom apartment in a different neighborhood.  Here, life was better than in their old apartment.  Sidik walked to school from this apartment.  Frequently, specifically approximately once a week, older students along the 25-minute walk bullied him, physically assaulted him, stole his possessions, and stole his lunch money.  For example, other students stole Sidik's shoes and backpack and on occasion, they stole a very special pencil case that his father had gotten for him for the first day of school.  In spite of the bullying, Sidik made some friends and enjoyed playing soccer and swimming in the nearby lake.  He started learning the city culture and dialect.

Those marginal improvements all changed when the family suddenly moved again to a home outside of Tashkent. This new area was very dangerous, and Sidik's parents would always shelter their children and ensure that they were not outside after dark.  This neighborhood was

---

[27] Ibid.

composed primarily of people from Kazakhstan, as they were close to the border with Kazakhstan. From this new neighborhood, Sidik had to walk two hours to school each day.

Eventually, the family was able to move back to their one-bedroom apartment and Sidik was able to finish high school. Sidik then attended a three-year college in Tashkent for acting at the Uzbekistan State Institute of Arts and Culture. Throughout his childhood, one of Sidik's happiest and most impressionable memories was that every week, his family would come together and eat a meal of dumplings and rice pilaf.

E. The Mamadjonov family fled Uzbekistan in 2009 and eventually settled in Connecticut.

Sodik Mamadjonov ultimately obtained asylum in the United States based on his claim of religious persecution in Uzbekistan. In 2008, Sidik obtained a visa to enter the United States. Sidik entered the United States in February 2009 on a claim of asylum related to Sodik's claim of religious persecution. He thereafter obtained lawful permanent resident status.

After living in a few different places in Virginia, Pennsylvania, and New York, Sidik eventually settled in Connecticut. He immediately began working at a grocery store and has worked continuously over the last 15 years. He married his wife in 2012, and had four beautiful children with her in 2013, 2015, and 2018. He financially supports his wife, mother, and four children, and assists his sister with her children as well. He values giving his children a strong education and supportive home environment.

II. **Nature and Circumstances of the Offense**

In early 2014, within five years of fleeing state-sponsored religious persecution, detention, and torture in Uzbekistan related to so-called radical Islamic practices, Sidik was, himself, questioned by law enforcement authorities in the United States, specifically, the FBI, about his brother's role in so-called radical Islamic activities in Syria. PSR ¶¶ 15-25. The FBI did not read

Mr. Mamadjonov his rights; did not provide him with a target letter; did not contact the Federal Defender Office; and did not record their questioning of Mr. Mamadjonov, but for the final interview.  Although a lawyer was present on one occasion, it was not a member of undersigned counsel's office and it does not appear to have been a criminal defense lawyer at all.  According to the PSR, the FBI interviewed him at least eight times.

On November 20, 2017, the FBI executed a search warrant at Mr. Mamadjonov's home, during which tine his pregnant wife, elderly mother, and three children under the age of three were present.  The FBI brought at least 32 law enforcement officers, including agents from other states, including local law enforcement, and including a K-9 unit.  The search and interrogation, according to the case agent, lasted about five hours.

On November 21, 2017, Mr. Mamadjonov went to the FBI office and took a polygraph examination.  The FBI interviewed him at that time.  During that interview, he stated, among other things:

> **(I)** You have withheld information. You admit that in the past. You –
>
> **(SM)** Yeah, because I was scared, sir. I was scared, sir. You know anyone doesn't want to have a terrorist brother or like a involving in Uzbekistan is a different. I didn't know like a American guys will work different you know like a nice game, but anyway I scared you know.
>
> (Time stamp - 1:12:38)

On December 22, 2017, Mr. Mamadjonov was arrested and detained in custody at Wyatt until January 18, 2018, at which time he was released on conditions of release, which included GPS monitoring.  He has remained on GPS monitoring for the 5 ½ years since.  His compliance on conditions of pretrial release has been perfect.  PSR ¶ 4.

On April 8, 2019, Mr. Mamadjonov's counsel filed a motion to suppress.  The Court held a hearing on November 30, 2023.  The Court denied the motion on January 13, 2023, finding that

Mr. Mamadjonov was not legally subject to custodial interrogation at the time of the November 2017 search and interrogation in his home.

In the 6.5 years between his arrest and trial, Mr. Mamadjonov's lawyers had extensive discussions with the government about resolving the case. Mr. Mamadjonov was willing to plead guilty to making false statements if the government was willing to drop the terrorism enhancement. The government was not willing to do so. For that reason alone, Mr. Mamadjonov went to trial. On March 7, 2023, the jury acquitted him of the terrorism enhancement as to all counts and convicted him of four counts of making a false statement. He made the following false statements:

1. May 29, 2014 interview with the FBI – answered questions as if Saidjon was alive and omitted that he may have been dead.

2. November 18, 2014 interview with the FBI – answered questions as if Saidjon was still alive, specifically that Saidjon was married and living in Turkey and that Saidjon had sent a package, and omitted that he may have been dead.

3. August 17, 2016 interview with the FBI – omitted information about Saidjon's potential death and cause of death.

4. False Statement in an Immigration Matter in connection with his request for naturalization – October 27, 2016 USCIS Immigration Services Officer interview.

Mr. Mamadjonov is extremely remorseful for making false statements and is embarrassed that he did, given how much he appreciates the United States and the opportunities it has provided to his family. In his PSR interview conducted on May 20, 2024, according to the PSR author, Mr. Mamadjonov "took full responsibility for his actions and was greatly remorseful." PSR ¶ 32. He also explained the context in which he gave the false statements was that he was scared for himself

and his family in light of his experiences with the police and legal system in Uzbekistan.  PSR ¶ 32.

In his letter to the Court, Mr. Mamadjonov takes responsibility and demonstrates remorse for his crimes:

> after evertyhing happened Fbi came to talk to me , i get scared becouse of experince in Uzbekistan agents police was brutal, I didnt know what to do what to say, yes i did false statment becouse of fear myself and future of my kids, i made wrong decision , i fully take responciblte for what i did.  i dont like to comit crime or do something illigal . i must to be good son good husband good father good uncle , i cant dicapoint me family, but it happened , i feel shamed front of them, also now i have criminal background. but i try my best and avoid all kind of mistakes or wrong decisions. thank you for all mr Judge Bolden, you was polite to me entire trial and treat me as a person no as a criminal, i apriacite it. Also i would like to thanks United States of America for providing me best atorneys . i would like to also say i dont have any problem with a United states of America, USA give me shelter food free healthcare job and peace. i hope i can stay he in peace and grow up my kids , take care of my mother and wife . thank you very much and please accept my apoligie .

Exhibit A (Letter to Court from Sidik Mamadjonov).

## III. Legal Analysis

The question before the Court is what sentence is minimally necessary to accomplish the goals of sentencing.

A. The applicable legal standard requires the Court to impose the sentence that is minimally sufficient to accomplish the goals of sentencing.

**1. The statutory factors and purpose of a criminal sentence.**

Pursuant to 18 U.S.C. § 3553, the Court is required to impose in each case a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2).  Those purposes reflect the need for the sentence that is imposed:

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2) (2009).  In determining what sentence will best achieve these purposes in each case, the sentencing court must consider the following factors:

1.    The nature and circumstances of the offense and the history and characteristics of the defendant;

2.    The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;

3.    Pertinent policy statements issued by the Sentencing Commission;

4.    The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and

5.    The need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1), (a)(3) - (a)(7) (2009).

### 2.  The Guidelines are not presumed to be reasonable.

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in a given case, it is not bound by that range. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  Sentencing courts are free to disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a).  This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the Guidelines.  See Pepper v. United States, 131 S. Ct. 1229, 1241 (Mar. 2, 2011).

### 3.  The Court should find that the applicable Guidelines' range is 0-6 months' imprisonment.

There are four potential Guidelines issues for the Court to resolve: (1) the applicable Guideline is 2B1.1, not 2J1.2; (2) the Obstruction of Justice/perjury enhancement does not apply; (3) a reduction for acceptance of responsibility applies; and (4) [govt enhancement] does not apply.

**Applicable Guideline.**   The plain language of the USSG provide that § 2B1.1 is the applicable guideline for a violation of 18 U.S.C. § 1001.  Appendix A of the USSG provides that the cross-reference to § 2J1.2 only applies if the statutory maximum for section 1001 has been enhanced to 8 years.  In this case, it has not.  <u>See</u> Paragraph 121.  The jury acquitted Mr. Mamadjonov of the terrorism enhancement, and it does not apply.  That is the end of the inquiry. If the higher statutory penalty does not apply, the cross-reference does not apply.  Notably, as discussed below, the cross-reference would also not apply even if the eight-year maximum did apply, but it is not necessary to reach that decision, because there is no dispute that the enhanced statutory maximum does not apply.  <u>United States v. Hatley</u>, 717 F. App'x 457, 463–64 (5th Cir. 2018) ("<u>Because his sentence did not carry an eight-year statutory maximum, applying Section 2J1.2 along with Section 2X3.1(a) was error.</u>").

Moreover, even if the enhanced eight-year statutory maximum penalty applied, in order for the cross-reference to apply, the element of the cross-referenced offense would need to be charged in the indictment and found by the jury.  That did not occur here with regard to any potential cross-referenced offense.  The only charged offense (terrorism enhancement) was acquitted by the jury. Any other potential charged offense (perjury) was not put to the jury.  The Second Circuit has ruled on this issue and squarely held that the cross-reference does not apply where the jury has not found the cross-referenced offense in its verdict:

> The cross-reference provision of § 2B1.1(c)(3) applies only if "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct)." U.S.S.G. § 2B1.1(c)(3) (2002) (emphasis added).6 Thus, the plain language of § 2B1.1(c)(3) indicates that § 2B1.1(c)(3) is applicable <u>only if the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense</u>.

* * * * * * *

16

> Following our decision in <u>Napoli</u>, the Sentencing Commission replaced the prior cross-reference provision with § 2B1.1(c)(3), and, in doing so, limited its applicability to situations in which the conduct set forth in the count of conviction establishes an offense "specifically covered" by another guideline. This change limits the applicability of the cross-reference provision to situations in which the conduct set forth in the relevant count of the indictment actually constitutes an offense covered by another guideline. Accordingly, we hold that <u>§ 2B1.1(c)(3) is applicable only if the elements of another offense are established by conduct set forth in the count of conviction</u> (and proven by at least a preponderance of the evidence)

<u>United States v. Genao</u>, 343 F.3d 578, 584 (2d Cir. 2003).  In addition, the Second Circuit has confirmed:

> In <u>Garcia</u>, we held that a district court may apply a cross-reference provision pursuant to § 2B1.1(c)(3) only if the facts alleged in the indictment establish the elements of another offense for which the other guideline is applicable. 590 F.3d at 315–16.
>
> We have explained that "corruptly" in the context of § 1505 means "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice."  United States v. Kay, 513 F.3d 432, 454 (5th Cir. 2007).  By contrast, under 18 U.S.C. § 1001, "[t]he requirement that the false representation be made 'knowingly and willfully' is satisfied if the defendant acts deliberately and with the knowledge that the representation is false."  United States v. Guzman, 781 F.2d 428, 431 (5th Cir. 1986).  <u>The generalized mens rea required to violate § 1001 is not sufficient to prove the more specific mens rea required to violate § 1505.</u> See United States v. Kim, 95 Fed.Appx. 857, 862 (9th Cir. 2004).  <u>Griego's indictment for violation of § 1001 alleged that Griego "did knowingly and willfully make a false, fraudulent and fictitious material statement and representation"; it did not allege that he specifically intended to subvert or undermine the due administration of justice.</u>  Because the facts alleged in the indictment do not support the application of U.S.S.G. § 2J1.2, the district court erred in applying the cross-reference provision under U.S.S.G. § 2.B1.1(c)(3).  <u>See</u> Garcia, 590 F.3d at 315–16.
>
> Accordingly, we VACATE the sentence and REMAND for resentencing.

<u>United States v. Griego</u>, 837 F.3d 520, 522–23 (5th Cir. 2016).

Moreover, the plain language of the cross-reference does not apply on its face.  The commentary to § 2B1.1c3, note 17 states:

2B1.1 Commentary:

> 17.  Cross Reference in Subsection (c)(3).—Subsection (c)(3) provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the <u>count of conviction establishes an offense involving fraudulent conduct that is more aptly covered by another guideline</u>.  Sometimes, offenses involving fraudulent statements are prosecuted under 18 U.S.C. § 1001, or a similarly general statute, although the offense involves fraudulent conduct that is also covered by a more specific statute.  Examples include false entries regarding currency transactions, for which § 2S1.3 (Structuring Transactions to Evade Reporting Requirements) likely would be more apt, and false statements to a customs officer, for which § 2T3.1 (Evading Import Duties or Restrictions (Smuggling); Receiving or Trafficking in Smuggled Property) likely would be more apt. In certain other cases, the mail or wire fraud statutes, or other relatively broad statutes, are used primarily as jurisdictional bases for the prosecution of other offenses.  For example, a state employee who improperly influenced the award of a contract and used the mails to commit the offense may be prosecuted under 18 U.S.C. § 1341 for fraud involving the deprivation of the intangible right of honest services.  Such a case would be more aptly sentenced pursuant to § 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions).

For the cross-reference to apply, the cross-referenced offense would need to be one that the count of conviction establishes, not alleged conduct occurring after the offense such as statements made in connection with a motion to suppress.  Moreover, obstruction of justice is not listed in the note and was not contemplated by the Guidelines.

**Obstruction of Justice**.  The government seeks to apply an obstruction of justice enhancement to statements Mr. Mamadjonov made in the affidavit in support of the defense motion to suppress (not in relation to the underlying charged conduct).  The Court should find that the obstruction of justice enhancement does not apply.  In order to support a finding of obstruction of justice, the Court must make a determination that Mr. Mamadjonov's statements in the suppression affidavit were demonstrably false, which they were not.  Rather, his statements were almost uniformly confirmed in the suppression hearing and to the extent that there was some minor

difference that difference was based on subjective interpretation and did not constitute intentional lies. The Court made no such finding in its ruling, and there is no basis to do so based on Mr. Mamadjonov's affidavit.

The fact that the Court denied the motion to suppress on legal grounds does not constitute a finding that Mr. Mamadjonov perjured himself or lied. The facts at the suppression hearing and trial revealed that there were 33 law enforcement officers, 27 of which were FBI personnel and six of which were local, including an agent from New York and one from New Jersey. Supp. Trans. (CX of Sgt. Morande) at 23. There was a dog and a K9 team. Supp. Trans. at 24. There were 8 people on the entry team. Supp. Trans. at 121. The entry team was armed with guns and wore protective vests, raid jackets, and hats. Supp. Trans. at 121-22. It was a cold day. Supp. Trans. at 122. It was early in the morning and Mr. Mamadjonov was in his pajamas. Supp. Trans. at 129. His wife was pregnant and present, as were his three children ages 1, 2, and 4. Supp. Trans. at 88, 152. Officers questioned Mr. Mamadjonov in his basement and offered him no food, nor his family any food. Supp. Trans. at 130. He was not read his <u>Miranda</u> rights and the interview was not recorded. Supp. Trans. at 92-96.

The PSR in paragraph 30 states "In his sworn statement, specifically with respect to (4), (5) and (7), Mr. Mamadjonov committed perjury and provided materially-false information to a judge." But it does not specify what part of those particular statements constituted "materially false information," and provides no support for the conclusion that any inaccuracies were intentional. The Court, in denying the suppression motion, made no such findings, and never found that any of the statements in the affidavit was untrue – it only decided that Mr. Mamadjonov was not in custody.

This testimony affirmatively verifies paragraphs 1, 2, 3, 4, 5, 6, 7 and 8 of the affidavit.

Although the PSR only critiques sections 4, 5, and 7 of the affidavit, each is set forth in turn (all

page numbers reference the Suppression Hearing Transcript):

**(1) Early in the morning on November 20, 2017, I was home in bed with my wife who was pregnant.  My mother and my three children were also home.**

- "It was around 7:00, or just prior to 7:00. Maybe around 6:50 a.m." (pg 124, lines 14-15)
- "Yeah, I would say 6:50, 7:00 a.m. we were knocking on his door." (pg 157, lines 1-2)
- "*His wife is there?* Yes. *Actually, pregnant wife?* Yes. *And his three kids?* Correct. *How old were his children?* His children were young, like preschool age and younger. I don't have – I don't have a clear recollection of their ages, but they were not --- they were younger than elementary school."(pg 87, line 24 – pg 88, line 9)

**(2) Federal agents broke open my front door.  I rushed to the door and they told me to put my hands up.  I was only wearing underwear.  I asked to put clothes on, but the agents did not let me go to my bedroom.  An agent brought clothes to me in the living room.  My wife, mother, and children were also in the living room.**

- "There was a storm door that they opened and broke the lock on, and then knocked and announced their presence on the main entry door." (pg 32, lines 10-13)
- "Mr. Mamadjonov answered the door." (pg 32, line 16)
- "He wasn't fully clothed, but he wasn't nude. He was wearing what I believe was like his sleeping attire. I believe it was a T-shirt and underwear, is my recollection." (pg 32, lines 19-22)
- "The agent told him to show him his hands, which he did, and then we went into the residence." (pg 33, lines 10-12)
- "I believe he asked for some clothes, which were gotten for him by other agents." (pg 35, lines 12-13)
- "*The first person through the door breaks that front storm door?* That is correct." (pg 84, lines 21-23)
- "*How was the lock broken?* The door was pulled open. *Forcefully enough to break the lock?* Correct." (pg 85, lines 20-23)
- "*The first person there was holding a long gun?* Correct. *Orders him to show his hands?* Correct." (pg 86, lines 7-11)
- "*He comes to the door in his sleeping clothes?* Yes. *His wife is there?* Yes. *Actually, pregnant wife?* Yes." (pg 87, line 21 – pg 88, line 2)
- "*And so among the people not allowed to move under order from with guns are Mr. Mamadjonov's pregnant wife and his three young children?* They were told to come to that couch area, and we were clearing the house."(pg 88, lines 17-21)
- "I did. I believe he was shirtless. *And how else was he clothed? What was he wearing?* Underwear, basketball type shorts." (pg 88, lines 19-24)

- "I believe he said he was cold, and somebody got him something to wear, like a sweatshirt." (pg 124, line 25 - pg 125, line 1)
- "*All right. Is there a reason that Mr. Mamadjonov was not allowed to go get the clothes himself?* Well, the rest of the house hadn't been secured, as in the agents needed to go into the different spaces in the house and make sure there were no active threats, people hiding with firearms, et cetera. *Well, let me ask you this, Agent Morande. If the premises had already been secured during the conduct of a search warrant, would you have allowed the subject of the investigation to roam freely through the house?* No, we would not." (pg 125, lines 5-18)
- "*And in the course of that, the agents secured the people who were in the house?* They did. And *everyone was essentially placed on a couch; is that right?* More or less."(pg 147, lines 7-12)
- "*It was just the screen door that was broken?* Correct." (pg 58, lines 9-10)

**(3) There were at least 20 agents.  Some of them were carrying rifles that they pointed at me.  Most of them were wearing bullet-proof vests.  There was also at least one dog.**

- "We had a number of roles, to include an entry team, a perimeter security team. We had linguists involved. We thought there was likely going to be a language barrier for some of the residents. We had interview teams. We had searchers. We had -- one of the main pieces of evidence that we were looking for was this iPhone. We have a K-9 that is specifically trained to locate computer evidence -- or digital evidence…" (pg 24, lines 8-16)
- "It's -- so at least the lead agent had a rifle, and how it was pointed I can't --- I can't tell you this day. But a rifle is a large weapon that would certainly be visible to Mr. Mamadjonov" (pg 33, lines 2-6)
- "*Of the other folks there. Am I right in thinking that all of the FBI agents are armed?* The agents, yes. *Including you?* Correct." (pg 81, line 23 – page 82, line 2)
- "*Who else was wearing bullet proof vests?* The entire entry team." (pg 82, lines 7-8)
- "*And you said at least one person had a rifle?* Correct. *How many agents were carrying rifles?* My recollection is one. *The first person in the door?* Correct." (pg 82, lines 9-15)
- "*Now, you are there with 27 agents – or FBI personnel?* Correct. *Plus some unknown number of local law enforcement?* Correct." (pg 84, lines 13-15)
- "They had on their protective vests. Some had hats and raid jackets. Some had rifles. Most of them, if not all of them, had their pistol on their hips, around their legs"(pg 122, lines 6-9)
- "*Okay. And that agent was armed? How was that agent armed?* If I remember correctly that agent had a rifle or his pistol drawn, ready. *I think you said that there were actually several agents who had rifles?* I would say three, four tops." (pg 144, lines 15-21)

21

**(4) A person who I thought was the boss of the agents told me that if I did not talk to them bad things would happen.  I believed that if l did not talk I would be taken to the police station.**

- "I have used that form before. *You don't remember whether you brought it with you when you went to question Mr. Mamadjonov?* I don't recall if I had it with me. *But you definitely didn't ask him to sign it?* I didn't, no. *And you didn't bring it and read it to him?* I didn't read it to him, no. *And to your knowledge he never signed a form like that that day?* I – yeah, I – I have no indication he signed that form, and I would have known that." (pg 95, lines 11-23)

- "*And you did not read him this exact litany of rights, did you?* I did not. *And you didn't hear anyone else read him these rights?* That is correct." (pg 95, line 24 – pg 96, line 4)

- "*And in that 302 did anyone claim to have read Mr. Mamadjonov his rights?* No." (pg 95, lines 8-10)

- "*Is it correct that at least one agent applied pressure to cause him to give truthful answers?* At least one agent applied what I considered to be the bad cop routine to him. *Describe the bad cop routine.* He, in essence, repeatedly told him that he should be telling the truth and that he needs to tell the truth. *Or?* I don't recall, as alleged in Mr. Mamadjonov's affidavit, "or bad things will happen." I don't recall that happening. *What do you recall?* I recall him saying that he really needs to tell the truth and that's why we're here." (pg 102, lines 7-19)

- "*Just to clarify for me, the other agent who did this bad cop routine, who was that?* That was my supervisor, Andrew Klopfer. *You were in charge of the operation, but he was in charge of you?* Yes. *At what point in the three hours did he do this bad cop routine?* It was well into the interview. I couldn't --- it certainly was not in the first 15 minutes. It wasn't at the end. It was somewhere in the middle. *Did you call him down?* No. *He just came on his own?* Yes. *Was he armed?* Yes. *Sidearm?* Yes." (pg 104, lines 6-25)

- "*I apologize if I asked you this. Was there any conversation about whether or not Mr. Mamadjonov – well, was there any conversation about a lawyers?* About a lawyer? *Was there any conversation about a lawyer prior to you going into the basement?* Not that I recall, sir" (pg 130, lines 5-11)

**(5) Five or six agents took me to down to the basement of my house.**

- "*Who went down to the basement at that initial stage, that first time you down with Mr. Mamadjonov to the basement?* It was myself, Mr. Mamadjonov, and my recollection is it was Task Force Officer Sergeant Morande." (pg 44, lines 15-20)

- "During a portion of that interview that occurred in the basement Michelle Vu, who is an agent from New York, participated in a portion of the interview, as well as agent named Matt Hohmann. His name is in the operations order. I can get that name for you, the spelling. And then also my supervisor, Andrew Klopfer, participated in a limited portion of the interview." (pg 48, lines 13-20)

**(6) The basement was unfinished. The part of the basement I was in had no window.**

- This fact is uncontested.

**(7) I was surrounded by agents on all sides.  I did not feel that I was free to leave the basement.**

- "*And you did not read him this exact litany of rights, did you?* I did not. *And you didn't hear anyone else read him these rights?* That is correct." (pg 95, line 24 – pg 96, line 4)
- "*And in that 302 did anyone claim to have read Mr. Mamadjonov his rights?* No."(pg 95, lines 8-10)
- "*Is it correct that at least one agent applied pressure to cause him to give truthful answers?* At least one agent applied what I considered to be the bad cop routine to him. *Describe the bad cop routine.* He, in essence, repeatedly told him that he should be telling the truth and that he needs to tell the truth. *Or?* I don't recall, as alleged in Mr. Mamadjonov's affidavit, "or bad things will happen." I don't recall that happening. *What do you recall?* I recall him saying that he really needs to tell the truth and that's why we're here. *And as this is happening, again, Mr. Mamadjonov's family is upstairs?* That is correct. *A number of federal agents with the guns?* There were a number of federal agents up there armed." (pg 102, lines 7 – pg 103 line 2)
- "*Just to clarify for me, the other agent who did this bad cop routine, who was that?* That was my supervisor, Andrew Klopfer. *You were in charge of the operation, but he was in charge of you?* Yes. *At what point in the three hours did he do this bad cop routine?* It was well into the interview. I couldn't --- it certainly was not in the first 15 minutes. It wasn't at the end. It was somewhere in the middle. *Did you call him down?* No. *He just came on his own?* Yes. *Was he armed?* Yes. *Sidearm?* Yes." (pg 104, lines 6-25)
- "My weapon was still on my hip. *Was it displayed?* You could see the pistol grip, but it wasn't out, sir. *And how about with Special Agent Litowitz, did he cover his weapon?* It was on his hip." (pg 132, lines 10 -16)
- "*Did you tell him he and his whole family could just leave?* I didn't say he and his whole family, but I made a point saying he could leave. *But you didn't tell him, for example, his wife could have left the house?* I never said that to him. *So if he left the house, as far as he knew, he would be leaving behind his pregnant wife?* If he did, then he would. *He would be leaving behind his three young kids?* That is correct. *And his elderly mother?* Yes." (pg 151, line 22 – pg 152, line 12)

**(8) Agents questioned me for I believe between four and five hours.  I was allowed to see my children and go to the bathroom 2-3 times during this time, always with agents present, including in the bathroom.**

- "We went upstairs when he needed to use the restroom." (pg 47, lines 7-8)
- "He was accompanied with us upstairs to the bathroom, but not in the bathroom with him." (pg 47, lines 16-17)

- *"And was he allowed to take breaks during the conduct of the interview?* He was. *Do you have any recollection as to how many breaks he took?* I remember I personally escorted him to the bathroom. He had to urinate." (pg 134, lines 15-21)
- *"There were times, though, when you went with Mr. Mamadjonov upstairs, correct?* When he needed to use the bathroom and, I believe, when he wanted to get something to drink." (pg 150, lines 21-24)
- *"When he wanted to go to the bathroom, again, he wasn't simply allowed to go to the bathroom by himself, correct?* I told him I needed to escort him up there, and he seemed okay with that. *And you did escort him up there?* I did. *And he left the door ajar so that you could see inside?* I asked him if he could keep the door ajar so I could see inside. He thought it was unsual. I explained to him why that needed to happen and he seemed okay with it. *So he complied?* He did. *And it stayed open?* It did." (pg 150, line 25 – pg 151, line 16)
- Special Agent Litowitz testified that the search lasted five hours and the interrogation in the basement was at least three hours. (pg 85)

Moreover, at trial, the jury was visibly shaken by the description of the nature of the search. Whether or not the Court suppressed the statements at issue as a matter of law, Mr. Mamadjonov's subjective interpretation of the search was consistent with testimony and certainly not demonstrably false.

The key for legal purposes is whether the statement was demonstrably false, or attributable to subjective interpretation, faulty memory, and inartful drafting. The latter applies here. Also, under relevant law, *specific intent* to deceive is necessary. United States v. Thompson, 808 F.3d 190, 196 (2d Cir. 2015) "[I]f a defendant objects to an obstruction-of-justice enhancement based on perjurious testimony, district courts must make a finding of specific intent to commit perjury, which occurs when '[a] witness testifying under oath or affirmation ... gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" (quoting United States v. Dunnigan, 507 U.S.

> The risks inherent in extending Lincecum even to Agudelo's vague affidavit are significant. First, any time a defendant like Agudelo submits an affidavit that is sufficient to justify a suppression hearing, he would automatically be subject to an enhancement for obstruction of justice if the suppression motion is denied. Such a rule effaces Dunnigan, where the Supreme Court held that an enhancement is appropriate only where the defendant acts "with the willful

intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Dunnigan, 507 U.S. at 94, 113 S. Ct. 1111. Extending Lincecum to these facts would also raise the troubling prospect that future defendants might either be deterred from pressing arguably meritorious Fourth Amendment claims or unfairly punished when they do. The commentary to § 3C1.1 highlights this possibility. It states, "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right," and cautions that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1 comment. (n.2).

United States v. Agudelo, 414 F.3d 345, 350 (2d Cir. 2005). But see United States v. Lewis, 62 F.4th 733, 746-48 (2d Cir. 2023) (distinguishing Agudelo) ("On the other hand, if a defendant submits a conclusory affidavit in support of a motion to suppress, the fact that the district court does not find the testimony credible does 'not necessarily mean he gave knowingly false testimony in his affidavit.'" (quoting Agudelo, 414 F.3d at 349)). See also United States v. Kunsman, No. 22-cr-21 (E.D. Penn.), Transcript at 24-25 (refusing to apply obstruction enhancement where the accused testified in district court in support of his motion to suppress and motion was denied). The PSR in paragraph 30 states "In his sworn statement, specifically with respect to (4), (5) and (7), Mr. Mamadjonov committed perjury and provided materially false information to a judge." But it does not specify what part of those particular statements constituted "materially false information," and provides no support for the conclusion that any inaccuracies were intentional. The Court, in denying the suppression motion, made no such findings, and never found that any of the statements in the affidavit was untrue – it only decided that Mr. Mamadjonov was not in custody.

**Acceptance of Responsibility.** Acceptance of responsibility and requests that he receive credit for accepting responsibility. Mr. Mamadjonov has accepted responsibility. He only went to trial for purposes of challenging the terrorism enhancement on which he was acquitted. Without the terrorism enhancement, he would have pled guilty. Under these circumstances, the law permits the Court to grant acceptance of responsibility and the Court should do so here.

Section 3E1.1 of the United States Sentencing Guidelines ("U.S.S.G.") outlines the "acceptance of responsibility" adjustment.  It reads as follows:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.  The term "preparing for trial" means substantive preparations taken to present the government's case against the defendant to a jury (or judge, in the case of a bench trial) at trial.  "Preparing for trial" is ordinarily indicated by actions taken close to trial, such as preparing witnesses for trial, in limine motions, proposed voir dire questions and jury instructions, and witness and exhibit lists.  Preparations for pretrial proceedings (such as litigation related to a charging document, discovery motions, and suppression motions) ordinarily are not considered "preparing for trial" under this subsection.  Post-conviction matters (such as sentencing objections, appeal waivers, and related issues) are not considered "preparing for trial."

Whereas the plain language of § 3E1.1(b) disqualifies a defendant from receiving an additional 1-level reduction if that defendant proceeds to trial, a defendant may still receive the 2-level reduction under § 3E1.1(a).  See § 3E1.1 cmt. 2 ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.").  Such a determination "will be based primarily upon pre-trial statements and conduct."  Id.  One example in which a defendant goes to trial and receives an § 3E1.1 adjustment is where the defendant does so to "assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)."  Id.

Even where a defendant goes to trial to assert and preserve issues unrelated to factual guilt, a defendant still must proffer "pre-trial statements and conduct" evincing an acceptance of

responsibility.  To do so, a defendant needs to carry a clean pre-trial criminal record: no new arrests, no disciplinary tickets, and no violations of release conditions.  See, e.g., United States v. Rodriguez, 928 F.2d 65, 67 (2d Cir. 1991) ("The second crime refutes the disavowal of future criminal activity implied by the guilty plea to the first crime."); see also United States v. Ortiz, 218 F.3d 107 (2d Cir. 2000) (affirming district court's denial of reduction where defendant "used marijuana on multiple occasions despite representations that he would not do so if continued on release"); United States v. Gauvin, 173 F.3d 798, 806 (10th Cir. 1999) (affirming district court's grant of reduction where defendant acknowledged he hurt federal officer and understood seriousness of his conduct, but otherwise denied legal culpability because he was "drunk and scared" and thus did not intend to cause injury).

Acquittal on one count and a conviction on the other, as in Mr. Mamadjonov's case, does not preclude a reduction.  The Second Circuit recently addressed this scenario in United States v. Roseboro, 835 F. App'x 640 (2d Cir. 2020).  In Roseboro, the defendant, Mr. Blake, advanced to a jury trial on seven counts:  one count of conspiracy to possess with intent to distribute 100 grams or more of heroin, and six counts related to murder.  Id. at 641–43.  Mr. Blake was ultimately found guilty on the drug count, but he was acquitted on all six murder-related counts.  Id. at 642. The district court (Arterton, J.) noted Mr. Blake was not precluded as a matter of law from receiving an acceptance of responsibility reduction.  Id.  Nonetheless, the district court declined to apply the reduction.  Id.

The Second Circuit concluded the district court did not err.  Id.  The Court reasoned that the defendant could have pled guilty to the drug charge while asserting his innocence to the murder-related charges.  Id. at 643 (citing United States v. De Leon Ruiz, 47 F.3d 452, 455 (1st Cir. 1995)).  To support this conclusion, the Court noted, "Nor is there any indication in the record

that Blake even offered to plead guilty to Count One in exchange for the government dismissing Counts Two through Seven—which he bears the burden to demonstrate." Id. (citing United States v. Broxmeyer, 699 F.3d 265, 284 (2d Cir. 2012)).  According to the Court, Mr. Blake showed no indication of pleading guilty on the drug count in the eleven months prior to when the government filed a superseding indictment with the murder-related counts.  Id.

Mr. Mamadjonov presents a different case than Mr. Blake.  The Court should credit Mr. Mamadjonov with acceptance because this is the rare case where he was ready and willing to plead guilty to the false statement charges in advance of trial and proceeded to trial because the government was unwilling to forego the terrorism enhancement.

**Government Resources.**  The government seeks a three-level enhancement for expenditure of government resources.  That enhancement only applies when the cross-reference applies.  The cross-reference does not apply for the reasons discussed above; therefore, the three-level enhancement does not apply.

Accordingly, under 2B1.1, the base offense level is 6.  Two levels are added under grouping.  Two levels are subtracted for being a zero point offender and two levels are subtracted for acceptance of responsibility.  This results in a total offense level of 4 and CHC 1 for a range of 0-6 months.

B.  There are four downward departures/variances that apply to Sidikjon Mamadjonov.

Four specific downward departures/variances apply here, in addition to the 3553 factors to support a sentence of time served.

**1. The Court should depart/vary downwards based upon family ties/responsibilities.**

Family ties and responsibilities is a well-recognized ground for departure. The commentary to Section 5H1.6 of the Guidelines was amended in 2003. The amendments in USSG § 5H1.6, comment. n.1(B), provide:

> Departures Based on Loss of Caretaking or Financial Support. – A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:
>
> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent due to incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
>
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
>
> (iv) The departure effectively will address the loss of caretaking or financial support.

Notably, courts have suggested that the family circumstances departure is intended to benefit the family of the defendant, and not necessarily the defendant herself. See, e.g., United States v. Galante, 111 F.3d 1029, 1035, 1037 (2d Cir. 1997). A sentencing court granting such a departure recognizes that there are costs to others that can outweigh any societal benefit to be gained by incarcerating the defendant. This Circuit has consistently deferred to the judgment of the district courts as to whether the circumstances of a particular case justify such a departure. See, e.g.,

United States v. Galante, 111 F.3d 1029 (2d Cir. 1997) (Second Circuit upheld district court's departure.  District court had relied on findings that defendant-father was primary caretaker and financial support for family, that wife's job prospects were limited, and that children would be adversely impacted in terms of their education and upbringing without him); United States v. Alba, 933 F.2d 1117 (2d Cir. 1991) (defendant, wife, two children and grandmother all lived with defendant's disabled father, who depended on defendant to help him get in and out of wheelchair – loss of defendant would risk destruction of strong family unit); United States v. Johnson, 964 F.2d 124 (2d Cir. 1992) (defendant solely responsible for upbringing of three children and grandchild).  Moreover, there is consensus that the single most important factor in preventing recidivism may very well be employment.  Findings on Best Practices of Community Re-entry Programs for Previously Incarcerated Persons, available at http://www.eisenhowerfoundation.org/docs/Ex-Offender%20Best%20Practices.pdf, at 8.

The record evidence demonstrates that Mr. Mamadjonov meets the circumstances in the policy statement to § 5H1.6, and in any event, the Court has the authority to vary downward and should do so.  Mr. Mamadjonov is the sole and only available caretaker for his wife and their four children, who are ages 6 and 9 (twins), and 11 and there is no one else who can fill his role.  Mr. Mamadjonov's wife stays at home with the children and does not work outside the home.  Mr. Mamdjonov is the sole financial provider for the family.  PSR ¶ 86 (stating that "Mr. Mamadjonov is the sole financial provider for his wife and children, and that presently, he is financially supporting his mother.").  Mr. Mamadjonov has introduced his children to his Probation Officer and to undersigned counsel.  Undersigned counsel's office provided childcare for them during the trial so that Mr. Mamadjonov's mother and wife could attend the trial.  They are beautiful, respectful, loving, and smart children, and the value of them having their father in the home

providing for their financial and emotional needs far outweighs the retributive goal of sentencing to punish Mr. Mamadjonov with a further sentence of incarceration.

### 2. The Court should depart/vary based upon Mr. Mamadjonov's record of employment.

Mr. Mamadjonov's consistent record of employment also warrants a downward departure or variance in this case, particularly when considered in combination with his extraordinary family responsibilities. Although employment is not "ordinarily relevant" to the determination whether a departure is warranted, U.S.S.G. § 5H1.5, the Second Circuit has held that it is an appropriate basis for a departure in exceptional or extraordinary cases, particularly where other bases for departures are present. United States v. Jagmohan, 909 F.2d 61, 65 (2d Cir. 1990) (considering immigrant's nine-year employment history as a basis for departure in combination with other factors). Mr. Mamadjonov has an extraordinary record of employment, particularly given his persecution and poverty in Uzbekistan. PSR ¶¶ 98-115 (documenting lengthy history of employment). The combination of Mr. Mamadjonov's history of employment, and in particular his current employment, in tandem with his family responsibilities, weigh in favor of a downward departure/variance.

### 3. The Court should depart/vary downward pursuant to the Mishoe decision.

Mr. Mamadjonov has never had any involvement with the criminal justice system and has never served any imprisonment prior to his arrest in this case. PSR ¶¶ 139, 141. Mr. Mamadjonov's lack of criminal history, as well as his record of perfect compliance on over six years of pre-trial release, make him a low risk to the public and weigh in favor of a downward departure/variance. In United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated: "Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed

to achieve.  That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses."  While the <u>Mishoe</u> decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here.  Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence.  Where an individual has never been incarcerated before, a noncustodial sentence may be adequate in providing deterrent effects.  <u>See also</u> <u>United States v. D.M.</u>, 942 F. Supp. 2d 327, 339 (E.D.N.Y. 2013) (sentencing a defendant to probation partially because his lack of criminal history suggests "that he is of low risk of re-offense"); <u>United States v. Aref</u>, 2007 WL 804814 at *3 (N.D.N.Y. 2007) ("Based upon [defendant's] lack of prior criminal history, and his personal characteristics, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I.").  In Mr. Mamadjonov's case, the concept of incremental punishment applies.  Because he has never been incarcerated, the month he spent incarcerated at Wyatt, and over six years spent on GPS monitoring and restrictive conditions of pre-trial release, are just as effective (or more effective) in promoting deterrence as an additional period of imprisonment.  There is no reason to suggest that an additional period of incarceration is necessary.

In addition, a Criminal History Category of I does not adequately reflect Mr. Mamadjonov's complete lack of any criminal justice involvement, since Category I includes those with some criminal history, as well as those with arrests that did not result in imprisonment.  For those who have had zero criminal justice involvement of any kind, the risk of recidivism is actually lower than others in Category I.  The two-level reduction, while certainly necessary, is not necessarily sufficient to reflect the full weight of zero criminal history.  <u>See</u> <u>United States v. Germosen</u>, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007).  In <u>Germosen</u>, the District Court, imposed a below-Guidelines sentence based upon aberrant behavior, lack of criminal history, and

recidivism statistics from the United States Sentencing Commission.  See United States v. Germosen, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007).  The court noted that "[m]inimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism."  Id. (citing United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005), http// www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.).

In a 2017 study, the Sentencing Commission determined that "Criminal history score and Criminal History Category (CHC) are strong predictors of recidivism."[28]  In addition, "[o]ffenders with zero criminal history points had a lower rearrest rate than offenders with one criminal history point (30.2% compared to 46.9%) . . . ."  Finally, the Commission concluded that, "[o]ffenders with zero criminal history points and no prior contact with the criminal justice system had an 11.7 percentage point lower recidivism rate than offenders with zero criminal history points and some prior contact with the criminal justice system, such as arrests or convictions that do not receive points (25.7% compared to 37.4%)."[29]

### 4.  Mr. Mamadjonov has made extraordinary post-offense efforts at rehabilitation.

Mr. Mamadjonov's remarkable post-offense rehabilitative progress provides grounds for a downward departure/variance.  Since his offense conduct ended over six years ago, Mr. Mamadjonov has:

- Remained on GPS monitoring, PSR ¶¶ 4-5, 139, 142;
- Remained on house arrest lock-down then home detention then curfew then freestanding GPS for a prolonged period of over 6 years with no reported violations, PSR ¶¶ 4-5;
- Complied with all conditions of pre-trial release perfectly, Id.;
- Maintained employment at all times, PSR ¶¶ 98-115;

---

[28] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12 at 6 (last visited May 10, 2021).
[29] Id.

- Encouraged his children to invest in their education;
- Support not only his own wife and four children, but also his mother and his nephew;
- Demonstrated the utmost respect for the counsel and the USPO, PSR ¶ 155.

The Second Circuit has recognized consistently that the Guidelines have not always adequately been considered rehabilitation efforts.  See United States v. Core, 125 F.3d 74, 76 (2d. Cir. 1997); see also United States v. Douglas, 713 F.3d 694, 703 (2d Cir. 2013) (stating that "[w]e do not hold that district courts may not approach cases of addicted defendants who seek treatment and show promise of changing their lives with compassion and with due consideration of the relative costs and effectiveness of treatment versus long prison sentences").  Thus, the Court of Appeals has authorized departures for post-offense drug rehabilitation, United States v. Maier, 975 F.2d 944 (2d Cir. 1992); post-arrest non-drug rehabilitation, United States v. Workman, 80 F.3d 688 (2d Cir. 1996); rehabilitation while serving a prison sentence, United States v. Core, 125 F.3d 74 (2d Cir. 1997); and for the achievement of the ordinary responsibilities of citizenship that is the product of substantial commitment sustained over time, United States v. Bryson, 163 F.3d 742, 748 (2d Cir. 1998).  In reaching these decisions, the Second Circuit has observed that the "awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society, can remove a case from the heartland of typical cases, thus constituting a valid basis for departure."  United States v. Core, 125 F.3d at 76 (citations omitted).  The reasoning behind these departures is the recognition that rehabilitation is a valuable goal.

> [P]recluding departures regardless of anything constructive the defendant might do after his arrest that benefits himself, his family, or his community, undermines the statutory standard for departures, 18 U.S.C. § 3553(b), as well as the statutory requirement to consider the "characteristics of the defendant," id. § 3553(a)(1).

* * * * * * *

34

> The successful rehabilitation of a criminal, on the other hand, is a valuable achievement of the criminal process. The [Sentencing Reform] Act recognizes this by requiring sentencing courts to consider "the need for the sentence imposed . . . to provide the defendant with needed educational, vocational training . . . or other correctional treatment [in the most effective manner]." 18 U.S.C. § 3553(a)(2)(D).

United States v. Core, 125 F.3d at 77.  Additionally, the Second Circuit has recognized downward departures to facilitate successful rehabilitation is consistent with just punishment and retribution because rehabilitation symbolizes an offender's desire to return and reintegrate into society.  See United States v. K, 160 F. Supp. 2d 421, 441 (2d Cir. 2001).

Courts in the District of Connecticut have departed/varied downward on this basis.  United States v. Thomas Recck, 3:15-cr-15 (JAM), Transcript (Doc. No. 42) at 76; United States v. James Cave, 3:15-cr-83(JAM), Transcript (Doc. No. 64) at 51.  Other courts in this district have also departed/varied downward based on post offense efforts at rehabilitation.  See, e.g., Judgment, United States v. Staggers, 3:18-cr-183 (JCH), Doc. No.  99 (D. Conn. Mar. 24, 2019) (Hall, J.) (imposing non-Guidelines sentence with variance based on "the defendant's post-arrest conduct and his extraordinarily rehabilitation"); Judgment, United States v. Balducci, 3:12-cr-249 (AWT), Doc. No. 35 (D. Conn. Apr. 8, 2013) (Thompson, J.) (departing downward for "extraordinary efforts at rehabilitation" and citing Maier decision).

C. A sentence of time served, along with the federal felony convictions applicable, prolonged period of home detention and gps monitoring and over six-year period of pretrial supervision accomplish the purposes of a criminal sentence.

Mr. Mamadjonov has been punished.  Punishment is not measured in a vacuum, but as against the individual.  Here, the fact that Mr. Mamadjonov has never been in trouble before in any way, suggests that the punishment of a federal criminal arrest, conviction, month of incarceration, house arrest, and over six years of gps monitoring and supervision is extremely severe punishment.  Moreover, he may lose the ability to remain in the United States and to raise

his children in a free country; his life's mission.  On top of that, the weight of this case on Mr. Mamadjonov's extended family has taken a toll on them in ways that cannot be measured by incarceration.  His brother-in-law was deported and left his sister with no father to raise her children.  His mother has suffered health problems.  Both his mother and sister have struggled with the stress of the last 10 years.  There is nothing this Court can do that would be more punitive than what has already happened, and to add more imprisonment would be unnecessary.  United States v. Stewart, 590 F. 3d 93, 141 (2d Cir. 2009) ("[I]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); see also United States v. Nesbeth, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) ("[S]ufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant.  There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants . . . . Many—under both federal and state law—attach automatically upon a defendant's conviction.  The effects of these collateral consequences can be devastating.").

Mr. Mamadjonov has been deterred.  It has been over six years since the offense ended and 10 years since it began, and Mr. Mamadjonov has not reoffended.  Far from it, he has established a respectful and engaged relationship with counsel and the United States Probation Office.  This fact demonstrates that the current conditions are working and that more restrictive conditions are not necessary to prevent re-offense.

Mr. Mamadjonov is not a danger to the public.  His offense was situational arising out of a deep-seated fear in the police and State-sponsored religious and cultural oppression that terrorized him for his entire life, including leading right up to the years immediately preceding this

offense.  As a result of his crimes, he is likely to be removed and returned to the country that oppressed him where he will again not be a danger to the public.

The Court must consider the types of sentences available.  Here, the most effective sentence is one that will allow Mr. Mamadjonov to remain connected to his employment and family.  There is simply no need for additional punishment, given the extremely severe consequences to which Mr. Mamadjonov has already been subjected.

As for general deterrence, it is not clear that the severity of a sentence (as opposed to the certainty of the imposition of some sentence) has any significant general deterrent value.  See United States v. Bannister, 786 F. Supp. 2d 617, 658 (E.D.N.Y. 2011) ("Except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment.").  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.[30]  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  It examined the effects of changes to both the *certainty* and the *severity* of punishment.  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severities and crime rates . . . [were] not sufficient to achieve statistical significance."[31]  The report concludes that the studies reviewed do not give much support to the hypothesis that increasing sentence severity enhances deterrent effects.[32]

## IV.    Conclusion

Sidikjon Mamadjonov spent the first half of his life facing religious, cultural, and ethnic persecution as a second-class citizen.  He fled State-sponsored use of the legal system to persecute,

---

[30] Andrew von Hirsch et al., CRIMINAL DETERRENCE AND SENTENCE SEVERITY:  AN ANALYSIS OF RECENT RESEARCH (1999).
[31] Id. at 45.
[32] Id. at 27; 45-48.

imprison, and torture Muslims and on that basis, was granted asylum in this country.  His own family was persecuted and his mother was detained and harassed by police.  Within this context, he fled to the United States, where he experienced freedom and a new life for his children, who would not be judged by their race, religion, and class, as he had been, but based on the strength of their ethics, work, and efforts.  His criminal actions perversely created harm and suffering that has resulted in a loss of that freedom and a potential return to tyranny.  The soul-crushing devastation of this reality on his life's purpose is the spiritual punishment with which Mr. Mamadjonov must reckon day in and day out.  It is a life sentence, and no matter what this Court does, his life sentence will never end.  Still, the role of this Court is to mete out just punishment in the world of man, and on that score, Mr. Mamadjonov has already been severely punished.  He is a felon.  He may lose his immigration status and will never become a citizen of the country that he loves as he dreamed. He was arrested and served a month in prison.  He has been supervised under extremely severe conditions, including GPS monitoring, for over six years.  His compliance has been perfect.  On the scales of justice, there is a history of extraordinary persecution balanced against the harm of this crime balanced against the significant punishment already rendered.

For the reasons discussed in this memorandum, in the Pre-Sentence Report, and in the exhibit attached to this memorandum, a sentence of time served (about a month in prison), along with the very prolonged period of pre-trial release (over six years) with stringent conditions, along with the collateral consequences of this prosecution, are sufficient to accomplish the goals of sentencing.

Respectfully Submitted,

THE DEFENDANT
Sidikjon Mamadjonov,

FEDERAL DEFENDER OFFICE

Date: June 26, 2024                    */s/ Kelly Barrett*
                                       Kelly M. Barrett
                                       First Assistant Federal Defender
                                       265 Church Street, 7th FL
                                       New Haven, CT 06510
                                       Phone: (203) 498-4200
                                       Bar No.: ct27410
                                       Email: kelly_barrett@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 26, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Kelly M. Barrett*
Kelly M. Barrett