UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 3:18-cr-34-VAB |
| v. | : | |
| | : | |
| SIDIKJON MAMADJONOV | : | July 3, 2024 |

## **GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing with respect to defendant Sidikjon Mamadjonov.

This case is about a man whose brother died in Syria fighting with a designated foreign terrorist organization; whose close associates were convicted of providing material support to terrorism; and who himself traveled to Istanbul – a known gateway for foreign fighters – carrying $37,000 in cash and no return ticket. It is about the lies that man told over the course of years to federal investigators attempting to protect U.S. national security and the lies he told to secure immigration benefits.

Mamadjonov was legitimately the subject of an FBI counter-terrorism investigation, one focused both on his brother's whereabouts and on his own possible ties to terrorism. Mamadjonov's lies to the FBI meant that the FBI's investigation had to continue, stretching on for years, until the FBI finally learned through a confidential informant that Mamadjonov had photographic evidence of his brother's death. Only after that information was confirmed, through an interview of Mamadjonov conducted during the execution of a search warrant, was the FBI finally able to close its investigation.

Mamadjonov's repeated lies, given the gravity of the investigation, warrant a Guidelines sentence.

**Background**

A.      **Islamic Terrorism in the United States**

Mamadjonov was first interviewed by the FBI on May 14, 2014. He was last interviewed in November 2017. During that time, the threat from violent Islamic extremists in the United States was very real.

Just one year earlier, radicalized Islamic immigrants killed 3 people and injured more than 260 others in the Boston Marathon bombing. *See, e.g.*, "Dzhokhar Tsarnaev's scrawled message: We Muslims are one body, you hurt one your hurt us all," *Washington Post*, Mar. 11, 2015, *available at* https://www.washingtonpost.com/news/morning-mix/wp/2015/03/11/dzhokhar-tsarnaevs-scrawled-message-we-muslims-are-one-body-you-hurt-one-you-hurt-us-all/.

In July 2015, a radicalized Islamic immigrant killed four Marines and one Navy sailor in Chattanooga, Tennessee. He was reportedly radicalized after a visit to the Middle East. *See* "Chattanooga shooter changed after Mideast visit, friend says," CNN, Sept. 15, 2015, available at https://www.cnn.com/2015/07/17/us/tennessee-shooter-mohammad-youssuf-abdulazeez/index.html.

In December 2015, a radicalized Islamic couple – one U.S.-born, and one immigrant – killed 14 people and seriously injured 22 others in San Bernardino, California. *See* "Both San Bernardino Shooters Were 'Radicalized," FBI Says," *Wall Street Journal*, Dec. 7, 2015, *available at* https://www.wsj.com/articles/both-san-bernardino-shooters-were-radicalized-fbi-says-1449522569.

2

In June 2016, a radicalized Islamic man, born in the U.S., killed 49 people at a nightclub in Orlando, Florida. *See* "FBI and Obama confirm Omar Mateen was radicalized on the internet," *The Guardian*, June 13, 2016, *available at* https://www.theguardian.com/us-news/ 2016/jun/13/pulse-nightclub-attack-shooter-radicalized-internet-orlando.

In October 2017, a radicalized Islamic immigrant from Uzbekistan killed 8 people and injured 11 others by driving a pickup truck into pedestrians and cyclists in Manhattan. *See* "Why Uzbek migrants are being radicalised," BBC, Nov. 1, 2017, *available at* https://www.bbc.com/news/world-asia-41834729/ (suggesting that "experience as migrants" rather than country of origin led to radicalization).

It was against this background, in this context, that the FBI conducted its investigation of Mamadjonov and his brother Saidjon.

**B.      The Conduct of Mamadjonov and Saidjon**

On January 20, 2013, Saidjon traveled to Turkey. Trial Transcript ("Tr.") at 76, 122-23; Gov't Ex. 101A. Saidjon never returned. *See* Tr. at 126. Instead, he died fighting in Syria with Al-Nusrah Front (ANF). *See* Presentence Report ("PSR") ¶ 23.

From January 19 through May 19, 2013, Mamadjonov was in regular contact with Saidjon. *See* Tr. at 113-14; Gov't Ex. 205. During that time, Mamadjonov sent over $3,000 to Saidjon and others in Turkey. *See* PSR ¶ 23; Gov't Ex. 207. Mamadjonov knew that Saidjon traveled to Syria to join Al-Nusrah, a group affiliated with ISIS. *See* PSR ¶ 23.

On May 27, 2013, Mamadjonov traveled with his mother, wife, and sister to Istanbul. *See* Tr. 137-147. Mamadjonov traveled on a one-way ticket, paid for in cash. Tr. at 138. Mamadjonov also carried $37,000 in cash outbound. Tr. at 149-50. Mamadjonov told an immigration officer that he was traveling to Turkey for one week of sightseeing and then

traveling to Uzbekistan for vacation. *See* PSR ¶ 10. At the time, Turkey was a known transit point for foreign fighters traveling to Syria. *See* PSR ¶ 9.

While abroad, Mamadjonov met with "three, four, five" guys for "three four days" who knew Saidjon. Tr. at 98; Gov't Ex. 212B-6. They talked about what was going on in Syria. *Id.* After learning of Saidjon's death, Mamadjonov decided to return home. *See* PSR ¶ 23.

On June 10, 2013, Mamadjonov purchased a return flight to the United States. Tr. at 139-40. He returned with his mother and his wife on June 11. *See id.*

On or about July 2, 2013, Mamadjonov received a DHL package from Turkey. *See* Tr. at 85; Gov't Ex. 201. The package contained Saidjon's iPhone. *See* Tr. at 85. The iPhone had a picture of Saidjon in military garb cleaning weapons, as well as a video from Saidjon to Mamadjonov that exhorted, "brother, come here." *Id.* The phone also had a picture of Saidjon after he was killed. *See id.*; Gov't Ex. 212B-4. Mamadjonov admitted to the content of the iPhone both when he was interviewed during the execution of a search warrant at his residence, and also the day after in a recorded interview:

| Interviewer: | Okay. You get this iPhone in the mail . . . . |
|---|---|
| Mamadjonov: | Yes. |
| Interviewer: | You look at it, there's the video on there of your brother asking, telling you, you should come over, right? |
| Mamadjonov: | Yes. |
| Interviewer: | You should come over and, and fight for the Muslims, right? In Syria, correct? |
| Mamadjonov: | Yes. |
| Interviewer: | And then also on that phone is a photograph of your brother who appears to be dead, right? |
| Mamadjonov: | Yes. |

4

Gov't Ex. 212B-5.

In December 2013, Mamadjonov hosted a party at his home. *See* PSR ¶ 14; Tr. at 96. The guests included several individuals who were subsequently charged and convicted of providing material support to terrorism. *See* PSR ¶ 14. At the party, Mamadjonov showed his guests the photographs and videos from Saidjon's iPhone. *See id.*; Tr. at 95.

According to one witness, Mamadjonov and his guests talked "like four, five hours." Tr. at 225. "It was a huge conversation." *Id.* With respect to Mamadjonov's trip to Turkey, the witness testified that Mamadjonov "wanted to go to Syria and to join" the fight. Tr. at 226; *see also* Tr. at 223. Mamadjonov wanted "[t]o follow . . . Saidjon's footsteps." Tr. at 227 & 232. Mamadjonov actually went to Syria, participated in training, and met the "Amir" (leader). Tr. at 227. Mamadjonov was ordered "to go back [home, because] it would be better for him to support and send funds" than to stay in Syria. Tr. at 224 & 228.

Although Mamadjonov impugns the credibility of the witness,[1] *see* PSR ¶ 14, the information from the witness was provided *before* it was known to law enforcement and *before* it was admitted to by Mamadjonov. Specifically, the witness was the first to tell law enforcement about the December 2013 party, the first to tell law enforcement about the iPhone, and the first to tell law enforcement that Mamadjonov showed pictures and videos from the iPhone during the December 2013 party. The witness was also the first to tell law enforcement that one of the pictures on the iPhone showed that Saidjon was dead. Mamadjonov's confessions as to each of

---

[1] In an email message to the Court, the probation officer, and undersigned counsel, dated July 1, 2024, counsel for Mamadjonov stated that Mamadjonov "does not plan to request the Court to make factual findings at sentencing." The government believes that this constitutes a waiver of any challenge to the factual findings in the PSR.

these points – made only after being confronted by the FBI – corroborate the reliability of the witness.

The testimony of the witness was also corroborated by recorded telephone calls in February 2015 between the witness and Abdulaziz Rakhmatov, both of whom were convicted of providing material support to terrorism. *See* Tr. at 241 & 243-44. In the calls, the witness and Rakhmatov discussed asking Mamadjonov to provide financial support for a foreign fighter. *Id.* at 244. The witness explained that they considered asking Mamadjonov because "in my understanding . . . Mamadjonov[] came back to the United States . . . with one reason, to help them out with the funds . . . ." *Id.* at 245.

**C.     The Offense Conduct**

Mamadjonov repeatedly lied to the FBI and an immigration officer. *See* PSR ¶¶ 15-22.

On May 14, 2014, Mamadjonov responded to an FBI request for an interview about the whereabouts and activities of Saidjon. PSR ¶ 15. Throughout this interview, Mamadjonov answered the FBI's questions as if Saidjon was alive, which Mamadjonov knew was not true. *Id.*

Mamadjonov was interviewed again by the FBI on May 29, 2014, where he lied about his actions in Turkey, including that he met with his brother, Saidjon. PSR ¶ 16**.** Mamadjonov also lied by saying that he believed Saidjon was in Turkey or Dubai when he knew Saidjon had been killed in battle in Syria. *Id.*

On September 8, 2014, Mamadjonov completed an Application for Naturalization, Form N-400, which he signed in the Part 12 section certifying that under penalty of perjury, the application and the evidence submitted were true and correct. PSR ¶ 17.

On September 12, 2014, Mamadjonov again claimed to not have had contact with Saidjon, that he had attempted to travel to Turkey in June 2014 to look for Saidjon, and that he planned to again travel to Turkey in December 2014 to look for Saidjon. PSR ¶ 18.

On November 18, 2014, Mamadjonov again met with FBI agents and continued to answer questions as if Saidjon was alive when Mamadjonov knew Saidjon had been killed. PSR ¶ 19.

On August 17, 2016, Mamadjonov was once again interviewed by the FBI about Saidjon's whereabouts and activities, and Mamadjonov continued to lie to the agents about many topics including that he received a package from Saidjon, knew that Uzbeks had left the United States to fight in the Syrian Civil War, knew any Uzbeks that had traveled to Syria, and knew that Saidjon had been killed in Syria. PSR ¶ 21.

On October 27, 2016, Mamadjonov again lied to a federal officer, specifically a USCIS Immigration Services Officer, regarding Mamadjonov's Form N-400, Application for Naturalization. In this interview, Mamadjonov affirmed his denial of ever being a member or associated, directly or indirectly, with a terrorist organization. PSR ¶ 22 In fact, Mamadjonov was associated with Azizjon Rakhmatov, a member of ISIS, and Saidjon, a member of ANF. *Id.*

On November 20, 2017, Mamadjonov was again interviewed by the FBI while the FBI executed a search warrant of Mamadjonov's home. PSR ¶ 23. In this meeting, Mamadjonov admitted to lying to federal law enforcement officials about his knowledge of his brother's death, among other lies. *Id.*

For over two years, Mamadjonov continually lied to FBI agents across multiple interviews about his conduct and his brother's conduct and whereabouts. Mamadjonov also lied

on a naturalization application and affirmed his lies to a USCIS Immigration Services Officer in a naturalization interview.

### D.   The Sentencing Guidelines

The government agrees with Mamadjonov that U.S.S.G. § 2B1.1 is the applicable guideline with respect to Counts One, Two, and Three. *See United States v. Genao*, 343 F.3d 578, 583-86 (2d Cir. 2003). Accordingly, the government calculates the applicable Guidelines sentencing range as follows:

| | |
|---|---|
| Counts 1, 2, and 3: | |
| Base offense level, § 2B1.1(a)(2) | 6 |
| Obstruction of justice, § 3C1.1 | +2 |
| Adjusted offense level | 8 |
| | |
| Count 4: | |
| Base offense level, § 2L2.2(a)(2) | 8 |
| Obstruction of justice, § 3C1.1 | +2 |
| Adjusted Offense Level | 10 |
| | |
| Greater of the Adjusted Offenses Levels Above | 10 |
| Increase in offense level, § 3D1.4(a) | +2 |
| Combined Adjusted Offense Level | 12 |
| Zero Point offender, § 4C1.1(a) | -2 |
| | |
| TOTAL OFFENSE LEVEL | 10 |

Mamadjonov is not known to have a criminal history, so the recommended sentence under the Guidelines calls for a term of 6-12 months' imprisonment, a fine of $4,000 to $40,000, and supervised release for 1 to 3 years.[2] Because Mamadjonov falls in Zone B of the Sentencing Guidelines, a term of probation may be imposed under the Guidelines in accordance with

---

[2] The government does not believe it has been established that Mamadjonov "likely will be deported after imprisonment," which would preclude a term of supervised release. *See* U.S.S.G. § 5D1.1(c). In an email message from the Deputy Chief Counsel in ICE's Office of the Principal Legal Advisor, dated July 1, 2024, undersigned counsel was advised that removal in this case was "unpredictable."

U.S.S.G. § 5B1.1(a)(2) (requiring conditions such as intermittent confinement, community confinement, or home detention). The term of probation should be for 1 to 5 years.

## ARGUMENT

### I.     Mamadjonov's False Testimony While Seeking to Suppress Evidence Should Result in an Obstruction of Justice Enhancement

#### A.     Relevant Facts

On April 8, 2019, Mamadjonov filed a motion to suppress statements made to law enforcement agents on November 20, 2017, and November 21, 2017. PSR ¶ 27. Mamadjonov accused the government of seizing Mamadjonov's person without an arrest warrant and questioning him for five hours in his basement. *Id*. Mamadjonov also alleged that his statements on November 21, 2019, came on the heels of his un-Mirandized interrogation the day prior. *Id.*

According to the PSR, Mamadjonov made materially false statements in his sworn affidavit. To wit:

> (4) A person who I thought was the boss of the agents told me that if I did not talk to them bad things would happen. I believed that if l did not talk I would be taken to the police station.

> (5) Five or six agents took me down to the basement of my house.

> (7) I was surrounded by agents on all sides. I did not feel that I was free to leave the basement.

PSR ¶ 27.

#### B.     Applicable Law

The Sentencing Guidelines provide for a two-level increase if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of the offense for which the defendant has been convicted. U.S.S.G. § 3C1.1.

The guideline provides a non-exhaustive list of examples that can constitute obstruction, including both perjury and "providing materially false information to a judge." *Id.* cmt 4(B) & (F). In applying the guideline, the Court "should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." *Id.* cmt 2.

In determining whether a defendant's statements were false, the statements "must be judged according to common sense standards and given their natural meaning in relation to their context." *United States v. Schafrick*, 871 F.2d 300, 303 (2d Cir. 1989). "If, in the context in which the statements were made, they were materially untrue, then perjury is established. This is so even if the statements could be literally true in isolation . . . ." *Id.* at 304.

The enhancement under U.S.S.G. § 3C1.1 "applies not only to successful obstructions but also to attempts." *United States v. Lincecum*, 220 F.3d 77, 80-81 (2d Cir. 2000); *United States v. Rodriguez*, 943 F.2d 215, 218 (2d Cir. 1991) ("[A]n enhancement for obstruction of justice necessarily contemplates that the obstruction must be discovered at some point."). The burden of proof is preponderance of the evidence. *United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003). "The obstruction of justice enhancement [under Section 3C1.1] ... is mandatory once its factual predicates have been established." *United States v. Friedman*, 998 F.2d 53, 58 (2d Cir. 1993).

To impose the enhancement, the Court "at a minimum . . . must identify the statements on which the perjury finding was grounded, find that they are material, and make explicit findings that [they were] intentionally false." *United States v. Hunt*, 82 F.4th 129, 142 (2d Cir. 2023) (cleaned up).

### C.      A Two-Level Increase is Warranted for Obstruction of Justice

Mamadjonov willfully made false statements to the Court in an effort to suppress admissions that he made to the FBI during the execution of a search warrant. According to Mamadjonov, however, his falsehoods were "minor difference[s] . . . based on subjective interpretation" that were not intentional. *See* Defendant's Memorandum in Aid of Sentencing, dated June 26, 2024 [Dkt No. 279] ("Def. Memo."), at 18-19. Mamadjonov obscures the issue by citing to a plethora of unhelpful testimony. *See id.* at 20-24. In fact, Mamadjonov's falsehoods were a deliberate attempt to retract the only truthful statements that he has ever made about Saidjon's whereabouts – an attempt that fully warrants an enhancement for obstruction of justice.

*Paragraph 2* of Mamadjonov's affidavit: Mamadjonov claimed that agents "broke open my front door." Anybody reading this statement would think that the FBI had forced entry into Mamadjonov's home, with concomitant damage done to his front door. In fact, it is undisputed that only the lock to a screen door was forced. *See, e.g.*, Transcript of Motion Hearing, filed Dec. 5, 2022 [Dkt No. 128] ("Hearing Tr."), at 58.

*Paragraph 3*: Mamadjonov claimed that "[s]ome of [the agents] were carrying rifles that they pointed at me." Anybody reading this statement would think that there were at least two agents pointing rifles at Mamadjonov. In fact, there was no testimony about even a single rifle, or any other firearm, being pointed at Mamadjonov. *See* Hearing Tr. at 122 (denying that a rifle was pointed at Mamadjonov).

*Paragraph 4*: Mamadjonov claimed that "the boss of the agents told [him] that if [he] did not talk to [the agents] bad things would happen." There was no testimony that Mamadjonov was threatened with "bad things"; to the contrary, there was testimony that no such statement had been made. *See* Hearing Tr. at 59.

*Paragraph 5*: Mamadjonov claimed that "[f]ive or six agents" took him to the basement. Anybody reading this statement would imagine a veritable basketball team of agents forcing Mamadjonov into his basement. The undisputed testimony, however, is that only two agents – both of whom testified at the suppression hearing – brought Mamadjonov to the basement. *See* Hearing Tr. at 44 & 59. It was also Mamadjonov himself who suggested going to the basement. *See id.* at 41-42. While other agents came down to the basement at different points during the interview, Mamadjonov's claim that five or six agents took him to the basement was simply false.

*Paragraph 7:* Mamadjonov claimed that he "was surrounded by agents on all sides." Mamadjonov does not cite any testimony to this effect, because there was none. To the contrary, Mamadjonov was seated with a large unfinished space behind him. *See* Hearing Tr. at 61.

*Paragraph 8*: Mamadjonov claimed that he was allowed to use the restroom, "always with agents present, including in the bathroom." Anybody reading this statement would imagine that agents were actually inside the bathroom while Mamadjonov was using the facilities, a situation that would be embarrassing if not intimidating. Again, Mamadjonov does not cite any evidence that agents went into the bathroom with him. To the contrary, the testimony was clear that agents were not inside, *see* Hearing Tr. at 47, but waited outside with the bathroom door ajar, *see id.* at 150-51.

Each of the statements noted above was individually false. Taken as a whole, Mamadjonov's affidavit would leave any reader with a completely inaccurate understanding of how the interview was conducted by the FBI.

Mamadjonov claims that the jury was "visibly shaken" by the description of the search. *See* Def. Memo. at 24. The government, however, reasonably decided not to waste the jury's

time by challenging Mamadjonov's effort to malign the conduct of the search and the interview – an issue wholly irrelevant to whether Mamadjonov was guilty or not. Likewise, the jury's view of the search – to the extent the jury had any view at all – is wholly irrelevant to whether Mamadjonov lied in his affidavit.

While Mamadjonov also seeks to shift the blame to his attorneys for "inartful drafting" of the affidavit, *see* Def. Memo. at 24, this is not a case involving a single misstatement or exaggeration. There were multiple individual inaccuracies, and the affidavit taken as a whole gives a completely misleading impression of what actually happened that day.

Finally, Mamadjonov points out that the Court denied his motion to suppress without finding that he made any false statements. *See* Def. Memo. at 19 & 25. That, again, is irrelevant. The Court did not need to make any such factual finding in order to deny the suppression motion, so its silence on the issue of whether Mamadjonov lied has no significance now that the issue is squarely presented.

The two-level enhancement for obstruction of justice is warranted here because Mamadjonov clearly tried to mislead the Court as to what happened on the day of the search. The affidavit as a whole is false and misleading, and there are several specific false statements that individually justify the enhancement. The two-level enhancement is an appropriate penalty for Mamadjonov's materially false statements to the Court.

### D.    In the Alternative, a Two-Level Increase Is Warranted Based On Mamadjonov's Lies On His Naturalization Application

The Court may also impose an enhancement for obstruction of justice because Mamadjonov's false statements on his naturalization application constituted an obstruction of the FBI's counter-terrorism investigation.

The Second Circuit's recent decision in *United States v. Al Fawadi*, No. 22-1078-cr, 2024 WL 1364700 (2d Cir. April 1, 2024), is squarely on point. In that case, Al Fawadi was convicted on one count of making a false statement to the FBI, in violation of 18 U.S.C. § 1001, and one count of making a false statement in an immigration application, in violation of 18 U.S.C. § 1546 – the exact same charges as in this case. *See id.* at *1. There, however, Al Fawadi had himself been a member of a designated foreign terrorist organization. *See id.* Al Fawadi was sentenced to 48 months' imprisonment, based in part on an obstruction of justice enhancement. *See id.*

On plain error review, the court of appeals upheld the application of the obstruction enhancement. First, the court of appeals held that it was not impermissible double counting to base an obstruction enhancement on conduct that was covered by a count of conviction – to wit, lying to USCIS and FBI officers. *Id.* at *2. Second, the court held that the timing of the false statements to USCIS – made before the investigation commenced – did not preclude application of the enhancement. *See id.* (This issue is not present here, because the false statements made by Mamadjonov to USCIS were made while the FBI's investigation was active.) Finally, the court of appeals held, on plain error review, that the district court's findings of obstruction were sufficient. "We do not require the district court to use magic words at sentencing." *Id.* (cleaned up).

Under *Al Fawadi*, the enhancement for obstruction of justice should plainly apply to Mamadjonov, because his false statements to USCIS were "'intended to hide his past activities'

from the FBI." Therefore, the false statements provide a second and independent basis – in addition to Mamadjonov's false statements in connection with the suppression hearing – for the obstruction of justice enhancement to apply.

## II.     Mamadjonov's Perjury and Lack of Acceptance of Responsibility Should Exclude him from an Adjustment for Acceptance of Responsibility.

### A.     Relevant Facts

On January 13, 2023, the Court denied Mamadjonov's motion to suppress and found that Mamadjonov was not in custody for the November 2017 interviews with law enforcement officers. *See* PSR ¶ 29. As argued above, Mamadjonov made multiple false statements that should be considered perjury.

In his presentence interview on May 20, 2024, Mamadjonov did admit to lying to federal agents and immigration officials about Saidjon. *See* PSR ¶ 32. Mamadjonov said he did not know the law and blamed his former attorney for giving him bad advice about the consequences of lying to federal agents. *Id.*

In his memorandum in aid of sentencing, Mamadjonov stated, "In the 6.5 years between his arrest and trial, Mr. Mamadjonov's lawyers had extensive discussions with the government about resolving the case. Mr. Mamadjonov was willing to plead guilty to making false statements if the government was willing to drop the terrorism enhancement. The government was not willing to do so. For that reason alone, Mr. Mamadjonov went to trial." Def. Memo. at 13.

In fact, plea negotiations with Mamadjonov were unsuccessful because Mamadjonov was also concerned about the immigration consequences of a conviction. Mamadjonov's attorneys had discussions about this issue with a former AUSA, who previously represented the government in this matter, as shown in an email attached hereto as Exhibit A. In the email, dated January 15, 2020, the former AUSA took the unusual step of provided Mamadjonov's attorneys

with the email address of the Deputy Chief Counsel in ICE's Office of the Principal Legal

Advisor for the purpose of discussing the immigration consequences of a conviction.

### B.       Applicable Law

The adjustment for acceptance of responsibility "is not intended to apply to a defendant

who puts the government to its burden of proof at trial by denying the essential factual elements

of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt

2. Such a determination "will be based primarily upon pre-trial statements and conduct." *Id.*

"Conduct resulting in an enhancement under § 3C1.1 [for obstruction of justice]

ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."

U.S.S.G. § 3E1.1 cmt. 4. Further, "[t]he Guidelines state that it is rare that a defendant should be

granted a reduction in offense level for acceptance of responsibility when the court has deemed it

appropriate to increase her offense level for obstruction of justice." *United States v. Defeo*, 36

F.3d 272, 277 (2d Cir.1994). Accordingly, "[t]he reduction for acceptance of responsibility is

unavailable, absent 'extraordinary circumstances,' to a defendant properly found to merit an

obstruction-of-justice enhancement." *United States v. McGrain*, No. 22-661-cr, 2024 WL

3075026, at *5-6 (2d Cir. June 21, 2024); *United States v. Fernandez*, 127 F.3d 277, 285 (2d

Cir.1997).

### C.       Mamadjonov Should Not Receive a Reduction of Offense Level for
###          Acceptance of Responsibility

Mamadjonov claims that he only went to trial to dispute the terrorism enhancement, but

this is inaccurate. According to the former AUSA who conducted the plea discussions,

Mamadjonov's concern about immigration consequences of a conviction was a significant

impediment to reaching any agreement. This is confirmed by the email shown in Exhibit A,

where the government took the unusual step of putting Mamadjonov's attorneys in touch with an attorney at ICE so that he could inquire about those consequences.

Furthermore, had Mamadjonov really been concerned only about the terrorism enhancement, he could have made concessions at trial (like admitting that he lied) and only put the government to its proof on the issue of the terrorism enhancement. *See, e.g.*, *United States v. Adekanbi*, 675 F.3d 178, 186-87 (2d Cir. 2012) (affirming sentence where district court found no acceptance of responsibility because defendant had not "admitted to the substantive offense and gone to trial only on the limited issue of [drug quantity]"). To the contrary, Mamadjonov challenged the entirety of the government's case. *See* Tr. at 611 (arguing in summation that statements may not have been lies because Saidjon may actually have been in Turkey); Tr. at 611-12 (arguing in summation that Mamadjonov had not lied willfully);  Tr. at 612-17 (arguing in summation that lies were not material). Because Mamadjonov put the government to its proof on every element, not just the terrorism enhancement, he is not entitled to an adjustment for acceptance of responsibility. *See, e.g.*, *United States v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013) (upholding denial of acceptance of responsibility where defendant "contested his guilt by arguing to the jury in summation that he lacked any intent to defraud his customers . . . .").

Moreover, Mamadjonov contested his guilt on Count Four, the violation of 18 U.S.C. § 1546. Count Four did not involve any terrorism enhancement, yet Mamadjonov still did not plead guilty and still put the government to its proof. *See United States v. Roseboro*, 835 Fed. App'x 640, 642-43 (2d Cir. 2020) (affirming denial of acceptance of responsibility where defendant could have pled guilty to drug charge while proceeding to trial on murder charges). Mamadjonov claims that *Roseboro* is distinguishable, but in fact, it is squarely applicable. He could have pled guilty to Count Four, but he did not do so.

Mamadjonov also sought to suppress statements that he voluntarily made (submitting a false affidavit to the Court in order to do so), and he sought to overturn the jury's verdict by challenging the sufficiency of the government's evidence as to materiality. Because Mamadjonov put the government to its proof, not just on the terrorism enhancement, but on every required element, he is not entitled to an adjustment for acceptance of responsibility.

Mamadjonov is also not entitled to the adjustment because of his willful obstruction of justice. There are no extraordinary circumstances – certainly, none identified by Mamadjonov – that would warrant an adjustment for acceptance of responsibility notwithstanding Mamadjonov's obstruction of justice.

Finally, Mamadjonov still describes Saidjon's conduct in Syria as "so-called radical Islamic activities." Def. Memo. at 11. It is undisputed that Mamadjonov's brother died fighting in Syria, and Mamadjonov admitted that his brother died fighting with Al-Nusrah Front. At the time of Mamadjonov's lies to the FBI, ANF had already carried out hundreds of attacks, including many suicide bombings. *See* Press Release, United States Department of State, "Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq," dated Dec. 11, 2012, *available at* https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm. Mamadjonov's characterization of his brother's conduct as "so-called radical Islamic activities" further indicates that Mamadjonov has not accepted responsibility for the seriousness of the offenses for which he has been found guilty.

## III.    Mamadjonov Is Not Entitled to a Downward Departure

Mamadjonov has argued that there are three grounds for a downward departure: (1) his family ties and responsibilities, (2) his record of employment, and (3) his post-arrest

rehabilitation. Mamadjonov also argues for a horizontal departure under *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001).

While the Court has the authority to grant a vertical departure on the first three grounds, Mamadjonov has not shown that a departure is warranted. The Court does not have the authority to grant a *Mishoe* departure, as explained below.

### A.      Family ties and responsibilities

Family ties and responsibilities "are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. Accordingly, a departure is appropriate on this basis only if the "offender characteristic or other circumstance is present to an exceptional degree." U.S.S.G. § 5K2.0(a)(4).

Mamadjonov is not entitled to a downward departure on this basis, because he has not shown that the relatively short sentence called for by the Guidelines – a Zone B sentence of 6 to 12 months – would "cause a substantial, direct, and specific loss of . . . essential financial support" to his family. *See* U.S.S.G. § 5H1.6 cmt 1(B)(i).  In particular, a sentence in Zone B can be fashioned in such a way that Mamadjonov could maintain his employment. *See* U.S.S.G. §§ 5B1.1(a)(2), 5C1.1(c). Moreover, Mamadjonov has a sister and a father, both of whom would presumably be willing to help care for his children (allowing his wife to seek work) and/or to provide financial support. *See United States v. Cutler*, 520 F.3d 136, 164 (2d Cir. 2008) (recognizing that downward departure may not be warranted "where other relatives could meet the family's needs or the defendant's absence did not cause a particularly severe hardship" (cleaned up)).

The government acknowledges that this departure argument is colorable, but it should be denied because Mamadjonov has not met his burden of showing that there is no Zone B sentence

that would avoid "substantially exceed[ing] the harm ordinarily incident to incarceration for a similarly situated defendant." *See* U.S.S.G. § 5H1.6 cmt 1(B)(ii).

**B.      Record of employment**

A defendant's employment record is "not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.5. Accordingly, a departure is appropriate on this basis only if the "offender characteristic or other circumstance is present to an exceptional degree." U.S.S.G. § 5K2.0(a)(4); *see United States v. Jaderany*, 221 F.3d 989, 996 (7th Cir. 2000) ("§ 5H1.5 recognizes that, for most defendants, holding a steady job is not extraordinary, but in fact expected.").

Mamadjonov is not entitled to a downward departure based on this basis, because it is not extraordinary for a defendant to maintain (and to have maintained) steady employment. In *United States v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990), the Second Circuit observed that the defendant "had been gainfully employed for the nine years since he had entered this country." *Id.* at 65. "Taken alone, this fact is not especially remarkable." *Id.* Nevertheless, the court upheld a downward departure in that case – a bribery conviction – because the defendant's "unusually unsurreptitious conduct in undertaking the bribery constituted a mitigating factor 'of a kind, or to a degree' not adequately considered by the Guidelines." *Id.*

The rationale in *Jagmohan* does not apply here, where Mamadjonov is asking the Court to consider his employment record in conjunction with his family circumstances – both of which are factors specifically covered by the Guidelines. The government has argued above that Mamadjonov has not sufficiently established that his family circumstances warrant a departure; his record of employment likewise offers no basis for a departure.

### C.      Post-arrest rehabilitation

A defendant's efforts at rehabilitation is not a factor that is considered in the Guidelines. *See* U.S.S.G. ch. 5, part H. Accordingly, a departure based on rehabilitation "is only available when a defendant's rehabilitation, compared to his or her 'starting point,' is sufficiently extraordinary to take the defendant out of the heartland of cases contemplated by the Sentencing Commission in formulating the Guidelines." *United States v. Middleton*, 325 F.3d 386, 389 (2d Cir. 2003); *see also United States v. Bryson*, 163 F.3d 742, 748-49 (2d Cir. 1998) ("Much depends on the baseline from which an individual's extraordinary rehabilitation can be measured.").

Mamadjonov is not entitled to a departure on this basis, because he has merely complied with the terms of his release and fulfilled his obligations to his children and family. There is nothing "extraordinary" about this conduct. *See Middleton*, 325 F.3d at 390 (vacating sentence because departure for rehabilitation was not warranted for defendant who "ceased using marijuana, participated in a substance abuse program, took narcotics tests, and maintained gainful employment," all of which were conditions of release).

In particular, Mamadjonov has not identified any "rehabilitation" relative to his "starting point" or his "baseline," *i.e.*, prior to being arrested.

The reported cases cited by Mamadjonov, in contrast, reflect extraordinary changes made by the defendants. *See United States v. Workman*, 80 F.3d 688, 701 (2d Cir. 1996) (defendant joined army and completed military service honorably, an effort "not undertaken at the spur of impending prosecution"); *United States v. Maier*, 975 F.2d 944, 948-49 (2d Cir. 1992) (upholding departure where district court "conscientiously examined all of the pertinent circumstances, including the nature of the defendant's addiction, the characteristics of the

program she has entered, the progress she is making, the objective indications of her

determination to rehabilitate herself, and her therapist's assessment of her progress toward

rehabilitation and the hazards of interrupting that progress").

The other reported cases cited by Mamadjonov did not actually hold that a departure was

warranted. *See United States v. Douglas*, 713 F.3d 694, 700-03 (2d Cir. 2013) (affirming

reasonableness of sentence notwithstanding defendant's claim of addiction); *United States v.*

*Bryson*, 163 F.3d 742, 746-49 (2d Cir. 1998) (vacating sentences where downward departures

based on rehabilitation were not justified); *United States v. Core*, 125 F.3d 74, 76-79 (2d Cir.

1997) (remanding for consideration of whether departure was warranted); *United States v. K*, 160

F. Supp. 2d 421 (E.D.N.Y. 2001) (deferring sentencing for defendant who was in drug treatment

program and making steps toward extraordinary rehabilitation).

Because Mamadjonov has not shown any rehabilitation, much less extraordinary

rehabilitation, relative to his starting point, his motion for a departure on this basis should be

denied.

### D.      Adequacy of Criminal History Category

The Guidelines permit both vertical departures and horizontal departures – that is,

departures from the calculated offense level and the calculated criminal history category,

respectively. Horizontal departures are covered by U.S.S.G. § 4A1.3, which permits both upward

and downward departures where the calculated criminal history category substantially under-

represents or substantially over-represents a defendant's criminal history or likelihood of

recidivism.

In *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001), the Second Circuit held that a

departure under U.S.S.G. § 4A1.3 may take into consideration the "relationship between the

sentence for the current offense and the sentences, particularly the times served, for the prior offenses." *Id.* at 220.

Under U.S.S.G. § 4A1.3, however, a downward departure "is prohibited" below "the lower limit of the applicable guideline range for Criminal History Category I." Also as relevant to this case, the current version of the Sentencing Guidelines has been amended to provide a reduced offense level for certain "zero-point offenders." *See* U.S.S.G. § 4C1.1.

Mamadjonov is not entitled to a *Mishoe* departure for three reasons. First, Mamadjonov is already at Criminal History Category ("CHC") I, and a departure below CHC I is expressly prohibited. U.S.S.G. § 4A1.3(b)(2)(A). Second, the recent amendment to the Sentencing Guidelines already addresses defendants like Mamadjonov who have no criminal history. Because he is receiving the benefit of this new adjustment for zero-point offenders, there is no basis for providing him a further downward departure. Third, even if the Court were to consider a disparity between the current sentence to be imposed and his prior lack of incarceration, the Zone B sentence that is recommended by the Guidelines allows the Court to impose an entirely reasonable sentence for somebody who has not previously been incarcerated. Therefore, even if the Court had the authority to depart under *Mishoe*, it should decline to do so.

## IV. Based on the Statutory Sentencing Factors, A Significant Sentence Should Be Imposed in This Case

### A. Applicable law

Although the Supreme Court has held that the Guidelines are not mandatory, *see United States v. Booker*, 543 U.S. 220 (2005), it has also held that courts must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. A district court "should begin all sentencing proceedings by correctly calculating the Guidelines range," and that range is "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines, a court must consider the factors set out at 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); "the need for the sentence imposed" to further the four purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any pertinent policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). The statute directs a court, having considered these factors, to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of federal criminal sentencing:

> (B)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (C)  to afford adequate deterrence to criminal conduct;
>
> (D)  to protect the public from further crimes of the defendant; and
>
> (E)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

District courts may not presume that a Guidelines sentence is appropriate. *Gall*, 552 U.S. at 50. But at the same time, "[t]he fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Id.* at 50 n.6. After all, while the Guidelines are not binding, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study

based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

> **B.      A Guidelines Sentence Should Be Imposed Given the Seriousness of the Offense and the Need to Deter Similar Conduct**

Based on an offense level of 10 and a criminal history category I, the recommended Guidelines sentencing range is 6-12 months. Taking the recommended Guidelines sentencing range into account, together with the other statutory sentencing factors as discussed below, the government submits that a Guidelines sentence should be imposed in this case.

> **1.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense**

Mamadjonov lied to FBI agents conducting a counter-terrorism investigation. While Mamadjonov had no obligation to speak to the agents, he did have a legal obligation not to lie to them. By lying to the agents, Mamadjonov caused the government to expend scarce resources that would have been better used to protect the public in other ways.

When the investigation began, the FBI had information that Saidjon died in Syria. *See* Tr. at 74. If Mamadjonov had refused to be interviewed, or had simply told the truth, the FBI would not have had reason to believe that Saidjon was still alive. Instead, Mamadjonov lied. He forced the FBI to consider the possibility that Saidjon, a lawful permanent resident of the United States, had become radicalized, had fought in Syria, and remained unaccounted for. The FBI could not simply ignore the information from Mamadjonov, who, after all, was Saidjon's brother. Mamadjonov's lie caused the FBI to expend years unnecessarily investigating Saidjon's whereabouts, in order to ensure that Saidjon did not return to the United States and become a threat to public safety.

Mamadjonov lied during multiple interviews, over an extended period of time, to different law enforcement agents. And, even before he was interviewed by the FBI, he lied to an immigration officer about the purpose of his travel to Turkey in 2013. He then lied on his naturalization application, and he lied to a USCIS immigration services officer during his naturalization interview.

Mamadjonov's repeated lies, on topics important to the national security of the United States, make this a case where a significant sentence is needed to reflect the seriousness of the offense.

### 2.     The Need to Provide Just Punishment

When Mamadjonov was interviewed by the FBI, he already knew that Saidjon was dead. Mamadjonov's only reason for lying was to impede the FBI's investigation into his own conduct, or possibly the conduct of his associates, who were eventually prosecuted and convicted in Brooklyn.

Mamadjonov claims that "[h]is offense was situational arising out of a deep-seated fear in the police and State-sponsored religious and cultural oppression . . . ." Def. Memo. at 36. The government does not doubt that Mamadjonov was afraid. His fear, however, was based on the knowledge that he had traveled to Turkey with the intent of joining his brother, that he had provided financial support to his brother, and that he was potentially exposed to criminal liability for what he had done.

Being afraid of the police (or the FBI) would not explain why Mamadjonov lied to the immigration officer when he traveled to Turkey, and it would not explain why he lied on his naturalization application. Those lies – and the lies that he told to the FBI – can only be explained by the knowledge that he had of his own potential wrongdoing.

26

Mamadjonov lied about Saidjon because he knew that Saidjon's death fighting in Syria could potentially implicate him. Mamadjonov lied to protect himself, and the consequence of those lies was to cause the FBI to pursue a fruitless investigation for years. Accordingly, a significant sentence is warranted to ensure that just punishment is imposed.

### 3. The Need for the Sentence Imposed to Promote Respect for the Law and Afford Adequate Deterrence to Criminal Conduct

A significant sentence is warranted in this case to promote respect for the law and to afford adequate deterrence to criminal conduct. There can be no doubt that a term of imprisonment within the recommended Guidelines range would have greater deterrent value, and would promote greater respect for the law, than a sentence of time served.

Mamadjonov makes a boilerplate argument that sentencing severity has no significant correlation with crime rates. *See* Def. Memo. at 37. This argument does not consider the facts of this case, and it should accordingly be rejected.

The facts of this case are that Mamadjonov lied, over a period of years, to FBI investigators conducting a counter-terrorism investigation. Mamadjonov also lied on a naturalization application and during a naturalization interview. The sentence imposed should reasonably reflect the need to promote respect for the law, by imposing a sentence commensurate with the severity of the crime, and it should afford adequate deterrence, by making clear that the crimes committed by Mamadjonov deserve and will receive a significant sentence.

### 4. The History and Characteristics of the Defendant

Finally, it may be the case – as Mamadjonov argues at length – that Mamadjonov was the victim of religious persecution in Uzbekistan. However, he came to the United States in 2009, when he was 23 years old. Mamadjonov clearly observed, and he surely knew, that his life in the United States was entirely different from his life in Uzbekistan – including any interactions that

he may have had with law enforcement or other government officials. Mamadjonov cannot blame his conduct in this case on his past in Uzbekistan.

In fact, it was Mamadjonov's decision to follow Saidjon to Turkey in 2013, and it was his decision to return to the United States weeks later after learning of Saidjon's death. Most importantly, it was his decision to lie to the FBI in 2014, and to continue lying to the FBI over the next few years. And it was Mamadjonov's decision to lie on his naturalization application, and to lie to this Court in an effort to defeat this prosecution. Mamadjonov made these decisions, and he should be held accountable for them.

### Conclusion

Based on the foregoing, the government respectfully submits that the Court should impose a substantial Guidelines sentence in this case.

Respectfully submitted,

VANESSA ROBERT AVERY
UNITED STATES ATTORNEY

EDWARD CHANG (ct26472)
Assistant United States Attorney
157 Church St., 25th floor
New Haven, CT 06510
Tel: (203) 821-3826

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*Edward Chang*

EDWARD CHANG

# Exhibit A

**From:** Morabito, Douglas (USACT) <DMorabito@usa.doj.gov>
**Sent:** Wednesday, January 15, 2020 10:33 AM
**To:** James P Maguire (James_Maguire@fd.org) <James_Maguire@fd.org>
**Cc:** Gates-Graceson, Courtney ⬛⬛⬛⬛⬛⬛⬛⬛; Ward, Steven (NSD) <sward@jmd.usdoj.gov>;
Ward, Steven (NSD) <sward@jmd.usdoj.gov>
**Subject:** S. Mamadjonov

Hi James,

I have copied Courtney Gates-Graceson on this email. Please feel free to contact her regarding the conversation we had about you client. Thanks.